J. T. SEITSINGER, Appellee, v. IOWA CITY ELECTRIC RAILWAY COMPANY et al., Appellants.

NEGLIGENCE: Acts Constituting Negligence—Street Car Collision
1 —Evidence. Evidence reviewed, with reference to a collision with a street car at a street intersection, and held to present a jury question as to the negligence of both parties.

TRIAL: Instructions—Objections—Failure to Make Before Submission. Failure to lodge a specific objection to an instruction before it is read to the jury precludes raising such point in a motion for a new trial, no explanation being offered for the delay. (See Section 3705-a, Code Supplement, 1913, now repealed.)

TRIAL: Instructions—Objections—Failure to Request Specific Instruction. Objections to instructions prior to submission, on the general ground that the court had failed to instruct as to the *effect of certain evidence*, must be followed by a request for a special instruction covering the point, or the objection will be waived.

TRIAL: Instructions—Applicability to Evidence—Loss of Time and Pain. Preferably, the court should, on the subject of future pain, instruct that plaintiff may recover for such as it is *"rea-*

*sonably certain"* he will suffer in the future. but it is not prejudicial error to instruct that he may recover for such future pain as *"he will"* suffer.

**TRIAL:** Instructions—Applicability to Evidence—Loss of Time and Earning Capacity. Evidence (a) of the character of personal injuries, (b) of the extent of time the party was disabled, and (c) of the present and possible future continuance of said injuries, furnishes basis for instruction as to recovery for loss of time and earning capacity.

**TRIAL:** Verdict—$1,800—Excessiveness. Verdict of $1,800 for personal injuries, loss of time, future pain, and injury to property, sustained.

*Appeal from Johnson District Court.*—R. P. HOWELL, Judge.

NOVEMBER 17, 1917.

ACTION for damages. Verdict of the jury and judgment for plaintiff. Defendants appeal. The facts are stated in the opinion.—*Affirmed.*

*Henry Negus* and *W. J. McDonald,* for appellants.

*Messer, Clearman & Olsen,* for appellee.

STEVENS, J.—I. Dubuque Street in
1. NEGLIGENCE: Iowa City, on which one of defendant's
acts constituting negligence : street
car collision: cars was proceeding northward at the time
evidence. of the accident in question, intersects Fairchild Street, on which plaintiff was driving eastward, at the time of the collision, with a team hitched to a milk wagon. From Davenport Street, which lies south of Fairchild, the grade of the street car tracks on Dubuque Street rises to the alley 14 inches, from alley to Fairchild Street 22 inches, and from center of Fairchild Street to Church Street 35 inches to each 100 feet. The exact location of Church Street is not shown. Dubuque Street is paved with bitulithic, and Fairchild with brick, paving. The street railway track of defendant is located in the center of the street. The distance from the sidewalk

on the west side of Dubuque Street to the center of its inter-
section with Fairchild is 32 feet.

It is claimed by plaintiff that the team he was driving
was traveling at a slow trot; that, about the time he reached
the west line of Dubuque Street, he observed a street
car, about three quarters of a block distant, coming north
on Dubuque; that he continued eastward across the track
until the rear wheel of his wagon was struck by the street
car, overturning the wagon and throwing him out upon
the paving; that, when he first observed the car, he thought
it was traveling at the usual speed of 8 or 9 miles per hour,
and that he could easily pass over the track before the street
car would reach that point; but that, when he was passing
over the track, he observed that the car was coming toward
him at a very rapid rate; that he sought to increase the
speed of the team, but was unable to clear the track, with
the result that he was struck by the car, as above stated.
Plaintiff, upon cross-examination, testified as follows:

"Q. Where did you say you were when you first saw
the car? A. I was, as near as I can recollect, where the
brick and paving on Dubuque Street join. Q. Fairchild
is paved with brick? A. Yes. Q. And Dubuque with
bitulithic? A. Yes. Q. Now, by that do you mean
the horses' heads were there or the place you occupied in
the buggy? A. About where I was. Q. Do you know
how far west of the west rail that is of the street car track?
A. I never measured it. I should judge it is 30 feet west,—
that might be a little more or a little less,—I couldn't say.
Q. Was your team on the walk or trot? A. Oh, they was
in the habit of going on a very slow trot as a rule, about
average of 4 or 5 miles an hour, sometimes might have
been going a little faster, sometimes a little slower, but
I wasn't hurrying them at all. Q. You continued on
down toward the track without changing your gait? A.

Why, yes. Q. You seen the car—you didn't hold your horses up or urge them on either? A. Not until I seen the car coming at me, and I then gave the lines one or two slaps, and one of the team was 3 year old,—she was the one that jerked and got me over, or I wouldn't got over as far as I did. Q. Where was the car when you slapped your horses to hurry them up? A. It was coming right at me, not very far off. Q. Where was it in regard to the south sidewalk crossing on Dubuque Street? A. I couldn't tell the number of feet, because I was trying to get out of the way. Q. Was it south of the sidewalk? A. I couldn't say as to that; my intention was to get there if I could. Q. Whereabouts were you at that time? A. In the wagon. Q. I mean in reference to the track, where was the wagon in reference to the track? A. Why, I was almost onto the track most between me and the horses— horses might have been a little over the track or near about on the track when I tried to hurry them up. I knew that was my only salvation to get over. Q. The car was in plain sight all the time, nothing to prevent you from see- ing it? A. I had to watch my team; I didn't watch the car all the time. I noticed when I started over where they was, and I supposed that the gait they claim to go, was going—I didn't know the gait they were traveling—but as street railways and various other cars go, I would have ample time to get across, no distance across the block, which I was pretty well acquainted with. Lived in town quite a while. Q. Your team wasn't frightened at the car, were they, when you slapped them to hurry them up? A. No, they was frightened at me. They were a very quiet team, wasn't cross or anything of that sort, because I had them to town every day. Q. I believe you said you thought the car was going 8 to 10 miles an hour? A. I couldn't tell, but that is what they was going, because they claim they go—they can't run any faster than 8 or 10 miles, or

didn't operate them—that is their claim.  Q.  Whereabouts was the hind wheel of the buggy when the car struck the buggy, in reference to the track?  A.  Must have been on the track, or else they wouldn't hit it.  Q.  Was it near the west rail or over toward the east rail?  A.  I couldn't tell you that; where they got they hit it.  Q.  You were looking out of the door of your wagon at the car to see where it was?  A.  I had to have my eyes on the team at that time, after I saw it approaching me as fast as it was.  Q.  You paid attention to the team and not the car from that on?  A.  When I saw the car coming as close as it was, my eye had to be on the team to get it over.  Q. Then from the time you seen the car and slapped the horses, you didn't look at the car after that?  A.  Hadn't time to, man can only do one thing at a time and do it right."

Two witnesses, the motorman in charge of the street car and a passenger thereon, were called by the defendant. The version of the accident as given by the motorman is as follows:

"Q.  And at the time you first saw Mr. Seitsinger, he was long round the sidewalk line or the gutter there at the intersection?  A.  No, I seen him sooner; I seen him cata-cornered across a porch there.  There is a house there.  I could see him through the porch.  I seen him coming.  Q. Where was the last stop you made that day before the accident occurred?  A.  I couldn't tell you.  Q.  You don't know where the last stop was you had?  A.  In town before we started out, as near as I know.  Q.  How fast was your car going at the time you reached Bloomington Street? A.  Oh, I should judge perhaps 12 miles or so.  Q.  You mean to say, at the time your car reached Bloomington Street that your car was only going at the rate of 12 miles an hour?  A.  12 or 15 miles, as near as I could tell. * * * Q.  Now, then, you said on your direct examination that when you saw Mr. Seitsinger you checked your car?

Yes, sir. Q. And you checked your car now because you thought now he was going to drive across the street, didn't you? A. Yes, sir. Q. After you checked your car, you then released the brake? A. After I seen or thought I had the right of way. Q. You thought in going up that street you had the right of way? Yes, sir. Q. And so, because you thought you had the right of way, then, you released your brake on your car? A. Yes, sir. Q. Now then, how far from the intersection, now,—the south side of that intersection,—were you when you first applied your brake? A. Well, I was somewhere—I couldn't say—80 or 100 feet from the intersection. Q. So you didn't apply the brake when you first saw Mr. Seitsinger? A. No, I just throwed off the current. Q. Now you say he was coming down there at a pretty good clip? A. Yes, he was trotting right along. Q. The team was stepping right along? A. It wasn't going fast, but it was trotting right along. Q. It was going what you would call a pretty good clip, wasn't it? A. Yes, sir. Q. And it was an enclosed and covered wagon, didn't you? A. Yes, sir. Q. And you thought he was going to attempt to drive across the street, didn't you, when you first saw him? A. Yes, until he looked out and stopped. Q. Now then, when his horses stopped, his horses' heads, as I understand it, was just three feet from the rails? A. Three or five feet—I wouldn't say—somewhere around there. I knew I had good, clear sailing—I wouldn't hit him. Q. That is the only thing you are sure of, that you had good sailing there? A. Yes, sir. Q. When this team was that far, you were still south, now, on the south sidewalk crossing of that intersection, wasn't you? A. Yes, sir, I was. Q. And he started his team up again? A. Yes, sir. Q. And drove on the track? A. Yes, sir. Q. And his team stopped, you say, right square on the track? A. Yes; his team

was across, but his wagon wasn't.  Q.  Jake had his head out the door looking down at you?  A.  Looking down at me like this (indicating).  Q.  And just sitting there on the track?  A.  Yes, sir.  Q.  Your car ran into the milk wagon?  A.  Well, I reversed when I seen —— Q. How many feet was you from Jake when you reversed that car?  A.  I was somewhere 7 or 8 feet.  Q.  So, as I understand it now, you was about 18 feet south of the south sidewalk line when you saw his horses' heads within 3 to 5 feet of the track—that is right, isn't it?  A.  I don't know.  I never figured it up.  Q.  That is your best judgment?  A.  I never figured it up—I wouldn't say.  Q.  It was somewhere in the neighborhood of 18 to 20 feet, wasn't it, south of the south sidewalk line of that intersection?  A.  I couldn't say.  Q.  What is your best judgment?  A. I haven't any—I never thought of it.  Q.  You haven't any judgment at all of the distance you were away from him at any particular time, have you?  A.  Well, I have particular times, but not exactly.  Q.  And it was at that time, any way, when you were south of that intersection, that he started his team up to drive on the track, wasn't it?  A.  Yes, sir.  Q.  And it was while your car was still south of the south intersection that you released the brakes, wasn't it?  A.  South of the intersection?  Q.  Yes, south of the south sidewalk line of the intersection—your car was still down there when you released the brake?  A.  I left my car—I had hold of my brake—I left the car go when I was going up because I thought he would be across when I got there.  Q.  That is why you drifted your car, because you thought he would be across when you got there?  A.  Yes, sir.  Q.  What I am getting at, going back to the other question, is this: that your car was still south of the south sidewalk line of the intersection when you released the brake, wasn't it, that second time?  A.  Yes.  Q.  What I mean is, you testified on

direct examination you applied your brake, didn't you? A. Yes. Q. And you testified on your direct examination that you released your brake, didn't you? A. Yes, sir. Q. Now, then, you testified on your direct examination that you applied that brake again, didn't you? A. Yes, sir,—I didn't apply it; I held it. Q. You never applied it the second time at all? A. I held it ready to apply if he wouldn't get across, but then I seen he would get across if he kept on going, and I just held my brake. Q. You just let your car go? A. Yes. Q. Did you turn any more power? A. I didn't—just drifted. Q. Did you apply that hand brake after the first time you applied it and released it? A. No, sir, I didn't. Q. Never applied that hand brake at all? A. No, sir, I didn't have time. When he stopped on the track, why I used my reverse. Q. You had your hand right there on the hand brake all that time, didn't you? A. Yes, sir. Q. Ready to apply that brake, didn't you? A. Yes, sir. Q. Then you went to work and took your hand off the hand brake and reversed the car? A. No, I didn't take my hand off, I still had my hand on the hand brake. Q. You didn't apply that brake in any particular, did you? A. I didn't then, because I thought he would get across; he wouldn't stop on the track. Q. So you thought all the time, now, from the time you first saw Jake, that he was going to go across that track there at that street, didn't you? A. Yes, I did. Q. And that you would have to operate your car very carefully with reference to that? A. Yes. Q. And if you didn't, there was going to be danger of a collision? A. When I thought he was going across. Q. You understand, now, all the time from the time you first saw Jake, there was danger of a collision at that particular point? A. Yes, if he would attempt to cross. Q. And you saw him driving right straight toward the track

in this covered milk wagon? A. Yes, sir, but when he looked at me I thought— Q. But he didn't look at you at any time until he was right square on the track? A. He looked at me when he stopped, when he stopped before he got on the track. Q. Stuck his head out of the door and waved at you? A. No, he didn't wave at me, he just looked at me."

The testimony as to the speed of the street car at the time of and immediately preceding the accident is at considerable variance. J. O. Schulze, president and manager of the defendant company, testified that the track of defendant company on Dubuque Street is about 1½ miles long; that the schedule running time is 10 minutes, and the speed of the cars thereon is 8½ miles per hour, without stops; that, if 8 stops are made, the maximum speed of the car, if the whole distance is covered in schedule time, would be about 20 miles per hour. The maximum possible speed of the car was 24 miles per hour, on a level track. The motorman and the passenger referred to testified that the car approached Fairchild Street at from 12 to 15 miles per hour. A witness called on behalf of plaintiff testified that he was riding a bicycle north on Dubuque Street when the street car in question passed him on Bloomington Street, 2 blocks south of Fairchild, and that, from his observation of the car's speed, and comparing the distance traveled by him upon his bicycle and by the street car, up to the time of the accident, he estimated the speed of the car to be from 20 to 25 miles per hour. A witness who resided on Fairchild Street, about a block and a half from the scene of the accident, heard the crash when about a block distant and went immediately to the scene of the accident, and this witness testified that the rear end of the car was about 10 feet north of the north sidewalk line of the intersection.

Two principal grounds of negligence were alleged in

plaintiff's petition: (a) Driving the car at a careless, negligent and excessive rate of speed, thereby causing the collision, and (b) that, by the exercise of ordinary care, the servant of defendants in charge of the car did see, or could have seen, plaintiff in time to have avoided the collision, and was negligent in not having done so.

Defendants admitted their corporate capacity and denied the remaining allegations of plaintiff's petition.

It is argued by counsel for appellants that plaintiff's injuries were the result of his own negligence in attempting to cross the track of defendants and stopping thereon in front of an approaching car. The motorman in charge of the car of defendants apparently concurred in the expressed belief of plaintiff that, by continuing his course east, he had ample time to safely clear the track before the car would reach the point of the collision. If, therefore, the injury was the result of plaintiff's negligence, it must have been due to something else than merely driving upon and attempting to cross the track.

On behalf of appellee, it is contended: First, that, if he was at fault at all, it was only in miscalculating the speed of the car, and that, if same had been traveling at the rate assumed by him and claimed by defendants, instead of in fact at a rapid, reckless and dangerous rate of speed, no collision would have resulted; and second, that, if the wagon in which plaintiff was riding was stopped upon the track, as claimed by the defendants, its servant in charge of the car was negligent in not having the same so far under control that he could have stopped the same in time to avoid the collision, and in failing to do so.

The motorman testified, as above set out, that, when he first observed plaintiff approaching the crossing, he applied the brakes so as to retard the speed of the car and bring same under control, but that, when plaintiff stopped, west of the track, he released the brake and continued to-

ward the crossing, upon the theory that plaintiff had seen him and intended to give him the right of way, and that further special effort upon his part to avoid danger of a collision would not be necessary. He admits that he saw plaintiff thereafter start to cross the track, and must have believed he had ample time to get out of the way of danger, or else he failed to use the means admittedly at hand and available for controlling the speed of, or stopping, the car in time to avoid the collision. In fact, it is claimed that, but for the stopping of the wagon upon the crossing, no collision would have occurred, so that, upon defendants' theory, the jury could well have found that plaintiff was guilty of no negligence until the wagon was stopped upon the track, if it was stopped. Why, if at all, the team was stopped before the wagon had passed entirely over the track and out of the zone of danger does not appear; but it should not be assumed that same was due to any voluntary act of the plaintiff, as the motorman testified that he observed plaintiff continuously looking in the direction of the approaching car from the time he started across the track until the very instant of the collision, and he was, therefore, in a position to realize the danger of a collision between the car and the wagon. It is incredible that he should have, under the circumstances, consciously remained upon the track without attempting to use some of the means apparently available to him to remove himself from danger.

Plaintiff was required to use ordinary care and prudence in approaching and attempting to cross the track of defendant, and such as might be expected of an average man under like circumstances. He was not, however, required to stop and look and listen, but only to make reasonable use of his senses to determine whether a car was in such close proximity as to render an attempt by him to cross the track perilous or dangerous; and, if the car

in question when he first saw it was so far away that he
could reasonably believe he had time to cross the track in
safety before it would reach that point, he was not guilty
of negligence, as a matter of law, in attempting to do so.
*Adams v. Union Electric Co.*, 138 Iowa 487; *Watson v.
Boone Electric Co.*, 163 Iowa 316; *Flannery v. Interurban
R. Co.*, 171 Iowa 238; *Dow v. Des Moines C. R. Co.*, 148
Iowa 429.

The motorman in charge of the car testified that he
was proceeding, until he reached the south side of the
intersection, at from 12 to 15 miles per hour, but the exact
speed at which the car was moving immediately before he
reversed it is. not shown.   One witness, however, who was
a block away at the time and heard the collision, testified
that the car was several feet north of the north sidewalk
intersection on Fairchild Street when he arrived.   Plain-
tiff denied stopping his team either before attempting to
cross or while crossing the track.   The testimony was
ample to require submission of the case to the jury.

II. Complaint is made of Instruction
No. 9.   No exception was taken to this in-
struction before the same was read to the
jury, but, at the time of filing the motion
for a new trial, objection was urged that the
court should have, as a part of said instruction, submitted
to the jury the question of concurrent negligence.   Before
the instructions were read, counsel for appellants objected
to the court's submitting to the jury the question of the
last clear chance, and this objection was the only one made
to this instruction at that time.   As we interpret and under-
stand this instruction, it does not submit to the jury the
question of last clear chance, nor does it apparently purport
to do so.   The instruction submits one of the grounds of neg-
ligence charged and relied upon by the plaintiff, but not the

2. TRIAL: in-
structions:
objections:
failure to
make before
submission.

question of last clear chance. While we do not wish to be understood as approving this instruction, it is not open to the exceptions and objections urged by counsel, and, as we can consider only the exceptions or objections raised in the court below, it follows that there cannot be a reversal on account thereof.

III. The general objection appears to have been made, before the instructions were read, that the court had omitted to include an instruction as to the consideration to be given by the jury to the mortality tables received in evidence. No instruction was given touching this matter, but none was requested. The omission was noticed by counsel before the instructions were read, and, if it was desired, counsel should have requested an instruction on this point. The court would doubtless have given an instruction, had request been made therefor.

3. TRIAL: instructions: objections: failure to request specific instruction.

IV. The court, in Instruction 13, in stating the elements of plaintiff's damages, if he was entitled to recover, included future pain and suffering, but, instead of limiting recovery therefor to such damages as the evidence showed it was "reasonably certain" he would suffer in the future, used the words, "he will."

4. TRIAL: instructions: form, requisites and sufficiency: future pain.

An instruction containing almost the identical language complained of was before the court in *Parks v. Town of Laurens*, 153 Iowa 567, 569, and held good. The court there suggested that the amount of proof required was, if anything, greater under the instruction given than would have been necessary had the words "reasonably certain" or "reasonably apparent" been used. It would, of course, have been better had the court submitted the question in the usual form, but we fail to see how appellant was prejudiced by the use of the language complained of.

Another objection made to this instruc-

5. TRIAL: in-
structions:
applicability
to evidence:
loss of time
and earning
capacity.

tion was that the court permitted plaintiff to recover for loss of time, earning capacity, and damages to his wagon, and it is now contended that there was not sufficient evidence to justify the submission of these matters to the jury. The evidence showed the character of plaintiff's injuries, and that he was disabled to a considerable extent for several weeks; that he had not, at the time of the trial, entirely recovered from the injury to his spine; and there was some evidence from which it might be inferred that he would suffer pain and impairment of his earning capacity in the future. This question has repeatedly been before the court, and ruled against the contention of appellant. *Cubbage v. Estate of Youngerman*, 155 Iowa 39; *Fisher v. Bolton*, 148 Iowa 651; *Scott v. O'Leary*, 157 Iowa 222; *Wimber v. Iowa Central R. Co.*, 114 Iowa 551.

V. There is but one remaining question

6. TRIAL: ver-
dict: $1,800:
excessiveness.

for our consideration, and that is whether the verdict is excessive. Numerous witnesses were called who knew plaintiff and had observed him both prior to and following the injuries complained of. Physicians were called, who made an examination and gave testimony tending to show that he had suffered a very severe, painful and possibly permanent injury to his back. Witnesses testified that he was unable to carry on as previously his occupation as a milkman, without assistance not before required, and that he was unable to perform some manual labor previously performed by him. The question was presented in appellant's motion for new trial and overruled by the trial court, which had the advantage of having seen and heard the testimony of the witnesses and observed the appearance and heard the testimony of plaintiff; and we are unable to say that the verdict was excessive.

Finding no reversible error in the record, the judgment of the lower court is—*Affirmed.*

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.