GUY FULLER, Appellee, v. ILLINOIS CENTRAL RAILROAD COMPANY et al., Appellants.

**RAILROADS:** Liabilities Arising from Operation—Crossing Accident—Jury Question as to Negligence. Evidence reviewed, in an action for injuries to an automobile driver at an obstructed crossing, and *held* that whether there was negligence in running the train at excessive speed, or in not giving warning by ringing of bell or blowing of whistle, and whether the driver, knowing the train was due, was guilty of contributory negligence in approaching the crossing at excessive speed, and not stopping, looking, or listening, were questions for the jury.

**WITNESSES:** Cross-Examination—Allowable Scope. An engineer, having testified on direct examination as to his efforts to stop the train, and to the condition of an air brake at the time of the accident at a railroad crossing, was properly cross-examined as to the distance the train would travel after the application of the brakes.

**TRIAL:** Instructions—Form and Language in General—Contributory Negligence. An instruction as to the contributory negligence of one at a railroad crossing, as to his duty to look and listen, having in mind the duty imposed upon the defendant of giving signals and warning upon the approaching of the train, was not objectionable, in that the jury would believe that the court meant that the defendants were required to have the whistle blowing, and to give some signal other than that of merely ringing the bell, especially in view of the other instructions stating properly defendant's duty as to giving signals.

**TRIAL:** Instructions—Issues and Theories in General—Construction as a Whole. Instructions must be considered together; and consequently, instructions complained of in instant case held not to be erroneous.

**TRIAL:** Instructions—Form and Language in General—Earning Power. An instruction in a personal injury action that, in estimating the damages, the jury should take into consideration the physical and mental pain and permanent injuries of plaintiff, but should exclude any consideration of any loss or impairment of earning power during plaintiff's minority, did not authorize the jury to award damages for impairment of plaintiff's earning power after he had reached his majority.

TRIAL:    Instructions—Issues and Theories in General—Pain or Anguish Suffered.    An instruction authorizing the jury to consider any pain or anguish that it is reasonably certain plaintiff will hereafter suffer, is proper.

*Appeal from Bremer District Court.*—M. F. EDWARDS, Judge.

JULY 2, 1919.

ACTION to recover damages from the defendant railroad company, and one of its engineers, in negligently, as is alleged, striking plaintiff, as he attempted to cross the railroad track in an automobile. There was a trial to a jury, and a verdict for plaintiff for $2,500, and the defendants appeal.—*Affirmed.*

*Helsell & Helsell* and *Dawson & Wermacher,* for appellants.

*Sager & Sweet,* for appellee.

PRESTON, J.—1. The nature of the action and the pleadings, substantially as appellants state them, and conceded by appellee to be correct, are: That plaintiff was 18 years of age; that, on or about the 18th day of June, 1914, the plaintiff, while driving an automobile in the incorporated town of Plainfield, Iowa, across the line of defendant's railway, north of the depot in said town, in the forenoon, came in contact with and was struck by a train, at a crossing over which he was driving with three passengers in the back seat of his car, he sitting alone in front. He alleged that there were buildings on each side of the public highway that he was traveling on, on each side of the railway track; that, at the time of the accident, and for some days prior thereto, two or three freight cars were situated upon the switch track located just west of the main track on the right of way; that, when a person was riding in an automobile within 300 feet of the railway track on each side of

the public highway going east, they obstructed and cut off the view of an approaching train from the south; that the main street of said town of Plainfield ran parallel to the main track of the railroad, and some 300 to 350 feet west of the railroad track; and that, when a person is going north on Main Street, parallel to the railroad, a large number of frame buildings and a cement building cut off and obstruct the sight of the driver until he is within about 20 feet of the company's track; that, before he reached the track and right of way, he looked and listened for a train continually, but did not see nor hear it until the train was within 6 or 8 rods of the automobile; that the train was going at an excessive rate of speed; that the whistle was not blown nor the bell rung until within a few rods of the automobile; that the whistle of defendants' engine was not sounded 60 rods south of the public highway, nor at any time within a few rods of the crossing, nor was the bell rung at said distances; and that the engine and train were so operated negligently that the train struck the automobile, smashing the front wheels and damaging the same, and it struck the plaintiff, injuring and bruising his body and breaking his left leg, injuring his thigh and hip; and that his left leg is now two or three inches shorter than his right leg; and that he is very nervous, has undergone great physical pain and mental anguish, and is permanently injured; that he has employed doctors, and has been to expense and has lost time and money on account of his injuries; and that said injuries were caused by the negligence aforesaid of the defendants, and he has been damaged.

Later, plaintiff amended his petition, and set up several grounds of negligence, two of which were submitted to the jury by the court in the instructions. These are:

"The charges of negligence made by plaintiff against the defendants, and which are submitted to you for consid-

eration in this case, under these instructions and the evidence, are as follows:

"1. Were the defendants negligent in operating said train through the town of Plainfield, Iowa, at said time, at an unusual, unlawful, and excessive rate of speed; and 2. In moving the said train to the crossing at the point where plaintiff was struck, without giving proper warning of its approach by ringing a bell or blowing a whistle, or otherwise?"

The answer was in general denial, except that the corporate capacity of the defendant railway was admitted, and that Hackett was the engineer who operated the engine at the time of the alleged accident, and that one of the engines of defendant company had struck an automobile at or about the time stated. In the second division of the answer, defendants alleged that they were operating a passenger train at the place stated, and that:

"The plaintiff, on said day, was engaged in running a taxicab or automobile for hire; that, just prior to the accident, the passenger train had stopped at the depot in the town of Plainfield, at which place plaintiff was present with his automobile, and that the plaintiff took the three passengers upon his automobile, knowing full well the location of the train and its presence at the depot; that, upon securing said passengers, plaintiff drove his automobile through the streets of said town to a crossing where said passenger train had to cross, and always did cross, and at said time was due to cross, all of which was well known to the plaintiff; that, coming down to the crossing, plaintiff was driving his automobile at an excessive rate of speed, 15 miles an hour or more, with full knowledge that the train was due to pass at said time, and without stopping, looking, or listening, plaintiff ran his automobile on and upon the crossing of the defendant; that, for 50 feet or more from the crossing where the automobile ran, the train was in full

view for a long distance, and had plaintiff looked, listened, or stopped at any place within the right of way, or even before reaching the right of way, or had he slowed down and approached the crossing with ordinary care, and looked or listened, he would not have failed to have seen the train and avoided the accident; and the defendants say that the accident was wholly and solely due to the negligence of the plaintiff, which was the proximate cause of the injury, and also, because of such contributory negligence, plaintiff cannot recover."

Twenty-nine points are made and argued by appellants. Two of these, and the ones most strongly urged as grounds for reversal, are that the evidence is not sufficient to show that the defendants were negligent, and that the evidence shows that plaintiff was guilty of contributory negligence, and that the evidence is such that the trial court, as a matter of law, should have so said, and directed a verdict for the defendants, and that this court should so say, on a review of these questions, after a determination thereof by the triers of the facts, who saw and heard the witnesses, and whose judgment was tested by the trial judge, who likewise saw and heard the witnesses. A large number of witnesses were examined, and counsel upon either side have made elaborate arguments, pointing out the evidence of the different witnesses, as they claim it to be, the contradictions therein, the alleged impeachment of some of the witnesses, the improbability of the stories they tell, and the circumstances bearing upon the credibility of the witnesses. Conceding the closeness of the fact questions, and that we, sitting as jurors, might have come to a different conclusion, the question is whether, under the rules of law, we should say that there is such an absence of testimony as to the negligence of defendants, or that the evidence as to plaintiff's contributory negligence is so conclusive, as that we should say that there is no substantial dispute. In their argu-

ments, counsel upon either side differ somewhat, and wide-
ly so at some points. In view of the points made, and the
arguments, an examination of the evidence is required, and
we shall state so much thereof as seems necessary, without,
however, attempting to give the circumstances which tend
to qualify the testimony of the different witnesses, and with-
out attempting to reconcile any conflict there may be there-
in.

The record has been carefully read. It appears that
plaintiff had lived at Plainfield about two years. He was
living with his father, about two blocks northwest of the
place of the accident. He had been driving a car two years,
prior to the accident. At the time he was hurt, he was driv-
ing an automobile for his father in the livery business.

The car had been recently overhauled. The train ar-
rived at the depot about 11:05 in the forenoon. Plaintiff
was familiar with the depot, railroad track, streets, build-
ings, and crossings. The place where plaintiff was struck
on the crossing is at least five blocks, of 300 feet each, up
the track, north from the depot. At the time of the trans-
action in question, he was, as usual, at the depot when the
train came in. Plaintiff carried the mail. Plaintiff got
the mail and three passengers in his auto. Plaintiff made
two or three trips across the platform to get the mail, when
the train stood there, before he took the passengers in the
auto. The train was at the depot when he left it. After
leaving the depot, plaintiff drove his automobile west about
300 feet, to Main Street, and then turned north, and drove
to the post office, on the west side of Main Street, where he
stopped, got down and out of his car, and carried the mail
in, and, after delivering the mail at the post office, drove on
north to First Street, then turned east, and went east about
180 to 200 feet, to where he was struck. The railroad track
angles northwest a little, between the depot and the place
of the accident, but is otherwise straight. The post office is

a little south of First Street. On the east side of Main
Street, and for two blocks south of First Street, are stores
and other buildings. These are between the route traveled
by plaintiff on Main Street, and the railroad track. There
are spaces between some of the buildings, but the street is
rather closely built up. At the corner where plaintiff turned
east from Main Street is a cement building, extending from
Main Street east to the right of way. The west part of
this building is two stories, and the east part, one. This
building is about 125 feet long, and it is 50 feet from the
back end of the building east to the center of the track.
Appellants contend that the evidence is undisputed that, in
going the route he did, plaintiff traveled 600 or 700 feet
farther than the train went, after he left the depot, to ar-
rive at the place of the accident; and from this it is ar-
gued that he was traveling fast, as defendants' witnesses
say, and that he drove around the north corner and to the
track recklessly. It is true that plaintiff did travel a great-
er distance than the train, but, under the evidence, about
500 feet, instead of 600 or 700. But the evidence does not
show that the train and plaintiff started from the depot at
the same time, nor is it directly shown when the train left
the depot, with reference to the time plaintiff did. It is un-
disputed that, at the time of the accident, there were two
box cars standing on a spur track, west of the main track
and just south of the sidewalk, on the south side of First
Street. They were not close together, but a little distance
apart, between the end of the cement building and the main
track of the railway. The spur track is 8 feet from the
main track. There is a dispute in the evidence as to how
far south these cars were; but the jury could have found
from the evidence that the north end of the nearest box car
was about 42 feet south of the sidewalk. In the second
block south of First Street, there are some coal sheds on
the right of way west of the track, extending north and

south.  According to defendants' plat, these sheds are approximately half a block long.  Plaintiff's automobile was in good condition.  It had mud chains on the rear wheels; it had rained the night before.  Plaintiff says he doesn't think the wheels slipped in the street; that the brakes did hold on that day, and he knew they would under those conditions; that the speedometer was not connected.  Defendants' engine was working properly.

There is a sharp conflict in the testimony as to the speed of both the automobile and the train, as they each approached the crossing.  The estimates of the witnesses as to the speed of the auto vary, and range from 6 to 20 miles an hour, and of the train, from 15 to 25 miles an hour. Plaintiff's evidence tends to show that those in the auto, or some of them, thought the train had gone by, north, before the auto reached the crossing.  Others of them say they noticed, when going to the post office, as to whether the train had gone by, and had not seen it.  One witness says the train "didn't pull out as it generally does.  I thought it was going on the side track, because it didn't whistle out of town."  Plaintiff testified that the train was not over 40 or 50 feet down the track, when he first saw it.  Under the evidence, a person could see up the track. a much greater distance, had it not been for the box cars.  Plaintiff's evidence is that, as he turned the corner at First Street, and approached the crossing, he watched and listened for the train, and did not hear anything of it; that he slowed up a little bit, right near the right of way.  When he saw the train, he put on his brakes, released the clutch, and tried to stop.  Plaintiff says he killed the engine by putting the brakes on so hard, when he was driving at such a slow rate of speed, killed it when he first saw the engine, when he was about 10 or 12 feet from the track; that he could not and did not see the engine until he was 10 or 12 feet from the track; that his car stopped at or right near the track,

when he put on the brakes, and then the train hit them. Defendants' evidence tends to show that a person could see down the track for a greater distance than testified to by plaintiff's witnesses. There is a slight rise in the surface of the ground, 8 or 10 feet west of the railroad track. The ground is level, west of that. He and other witnesses in the car and others testify that, from the corner west to the point of the accident, plaintiff was not driving at more than 7 to 10 miles an hour. Others in the car say that they saw plaintiff watching and listening, and that he was looking down the track. One of the first witnesses who arrived at the scene, after the accident, testifies that the automobile was on the north side of the road, and turned over; that plaintiff was lying in the roadway, and others of the occupants of the auto were back of it, and another, 20 or 25 feet north of the car, and another, about 30 feet further north; that one of them was 50 feet north of the center of the road, with her head toward the track. The engineer testifies that the train was stopped within about 300 to 350 feet, but that he paid no attention to the distance. Other witnesses say it was farther north. First Street was much used as a highway by travelers coming to the town from the east and west, and is 60 feet wide.

The evidence is in conflict as to the blowing of the whistle or the ringing of the bell. Plaintiff's witnesses testify that no bell was rung or whistle blown, and defendants' witnesses testify that they heard either the bell or the whistle. Some of the witnesses are more positive than others. Plaintiff and the other three occupants of the auto testify that no whistle was blown. McGowan, painting on a building near the track, says:

"I am positive that the whistle or bell didn't sound. I was kind of listening, as I worked."

Hinmon testified that he was standing near the track down toward the depot, when the train went by, and that he

didn't hear any whistle nor the bell, as the train left the depot, going north. Smith says he paid attention to the train as it proceeded north from the depot, and that he did not hear the whistle blown nor the bell rung. Some of defendants' witnesses, other than the train crew, testified that they heard the bell, but no whistle; while others testified that they heard the whistle, but no bell. The engineer says that he sounded the crossing whistle about 12 rods from the depot, and about 12 rods from the crossing; that there were three or four crossings in there; and that this one warning whistle was meant for all the crossings between the depot and the place of the accident. According to defendants' plat, the first crossing north of the depot would be about 450 feet from the depot. The fireman testified that the whistle was blown at about a certain switch, which would be about the same distance. Other witnesses for defendant say that the whistle was blown at different places, one of them saying that it was within a block of the depot. The engineer testifies that there was an automatic bell ringer on the engine, and that it rings by air; that, when the air is turned on, the bell rings until the air is shut off; that he started the bell to ringing before he started the engine; and that it was ringing before, and at the time the engine started from the depot, and did not stop until after the accident; that, after he started back to where the automobile was struck, he noticed that the bell was still ringing, and went back and told the fireman to cut the bell ringer off, which was done. The engineer is corroborated by the fireman. It may be necessary to later refer to other items of evidence, but we have pointed out the evidence somewhat fully. We shall not go into further detail, but enough to show that there was a conflict in the evidence at this point for the jury.

It is argued by appellants that the physical facts are such that, if plaintiff had made reasonable effort to listen

or look, he could have heard or seen the train approach;
and that, under the evidence, plaintiff could
have seen the train when he was 60 feet away
from the crossing; and that this was plenty of time for him to have stopped; and
that, therefore, plaintiff was guilty of contributory negligence. Appellee's answer to
this is that appellants' contention that plaintiff could have
seen the train in time to have stopped, is not borne out by
the record; that, because the box cars and coal sheds were
west of the main track, and the box car nearest the crossing only 42 feet from the sidewalk, and 8 feet from the main
track, the train at that time would have been more than 200
feet south of the crossing; and that this fact is shown by
defendants' plat. Appellee says, too, that he was justified in
believing that defendant would sound the necessary warning to warn him of the approach of the train, and that the
evidence shows that plaintiff did use his senses of sight and
hearing, as he approached the crossing. It may be that, if
plaintiff had stopped his car at a point 60 feet west of the
crossing, or had he, at that particular instant, looked south,
and had the train been at just the right distance south of
the crossing, to be within the line of his vision, he could
have seen the train, by looking down west of the box cars.
But unless the train was at a certain point south of the
crossing, it would not be seen. Plaintiff was moving, and
as he moved eastward, his line of vision would be more obstructed. He was not required to stop at the corner of the
cement building at the point 60 feet west of the crossing.
It was necessary for him to give some attention to the
driving of his automobile. The conditions were such that
both plaintiff and defendants were required to use greater
care than they would under other circumstances. Without comparing the facts of this case with other cases cited,
or discussing such cases, it is our conclusion that there was

1. RAILROADS :
liabilities arising from operation : crossing
accident : jury
question as to
negligence.

sufficient evidence to take the case to the jury on both the propositions which we have been discussing.

2. Appellants make the point that the court erred in overruling their objections to questions propounded witness Hackett. The objection is that the court allowed too wide a latitude in the cross-examination.

2. WITNESSES : cross-examination : allowable scope.

Proper objections were made by defendants, which were overruled. The witness was asked:

"Q. Well, would that train run 300 to 350 feet after the application of the emergency brake, on a train of that kind, if everything was in good shape?"

The answer was that it would depend upon the speed at which the train was going, and the condition of the place, whether level, up hill, or down hill, and the amount of pressure that would be applied, etc. Another question was, whether such a train of that weight would run that distance after the application of the brake, the train running at, say, 10 miles an hour. Witness stated that, under such conditions, he did not think it would, and that it would probably not run over 150 to 200 feet. The witness had testified on his direct examination as to what he did in an effort to stop the train, and the condition of the train at the time, and that the air was acting, along and on the entire train, and working that day; that he did what he described just as soon as he could. It is quite clear that the questions here complained of were proper cross-examination, and within the discretion of the trial court. The witness is one of the defendants. Defendants' witness Farr was asked:

"Q. Do you know about how rapidly the automobile was moving then?"

Plaintiff's objection that the question was incompetent, and no foundation laid, was sustained. Thereafter, a further foundation was laid, and the witness stated that the

automobile was going something like six miles an hour. No showing was made as to what the witness would answer, whether yes or no. The objection to the question asked witness Dubois was properly sustained.

3. Most of the instructions are complained of. By Instruction No. 1, the court stated the issues to the jury. The complaint here in regard to this is that the court practically recites all of the allegations of neg-

3. TRIAL: instructions: form and language in general: contributory negligence.

ligence set out in the petition, and that, by Instruction No. 5, the jury was told that they should consider but one. Eight or ten cases are cited by appellants, to the prop-

osition that plaintiff is limited to the negligence charged. There was no exception to Instruction No. 1. Furthermore, we do not read it as does appellants' counsel. There are eight grounds of negligence set up in the petition, and they are not, as counsel claims, practically copied in this instruction. It is true that, in Instruction No. 5, the court did say to the jury that plaintiff makes specific charges of negligence, and that plaintiff must establish at least one of said charges before he can recover, and then submitted to the jury the two grounds which we have heretofore set out; but neither Instruction No. 1 nor No. 5 sets out the other grounds of negligence stated in the petition, as claimed by appellants. Further objection to No. 5 is that, under the circumstances of this case, if the train stopped at the depot, the law does not require that the bell should be rung all the time, 60 rods from the crossing, and if the crossing was within 60 rods of the depot, the ringing of the bell from the time the train started until the accident occurred, would be all that the law would require, and a sufficient compliance with the statute. No cases are cited by either party on this proposition, nor is the statute even cited. The exception assumes that the bell was rung from the time the train left the depot until the accident occurred. As before

shown, there was a conflict in the evidence as to this. The undisputed evidence is that it was more than 60 rods from the depot to the place of the accident. The statute, Code Section 2072, provides that the whistle shall be twice sharply sounded, at least 60 rods before a crossing is reached, and after the sounding of the whistle, the bell shall be rung continuously until the crossing is passed. We think there was no error at this point.

4. The exception to Instruction No. 6 is that it assumes that a reasonably prudent man would have blown the whistle and rung the bell, under the circumstances, in approaching that crossing. Counsel have selected a few words from a sentence, and by this seek to give the instruction the interpretation contended for. Taking the instruction as a whole, the question of what an ordinarily prudent man would have done, under the same circumstances, was left to the jury. In like manner, appellants single out and criticize parts of Instruction No. 7. The instruction as a whole is correct. The further objection is made that the jury would believe from this instruction that the court meant that defendants were required to have the whistle blowing, and to give some other signal than that of merely ringing the bell; and that all the signal defendants were required to give was to have the bell ringing. We think the criticism is not justified. This instruction deals with the question of contributory negligence, and states the duty of the plaintiff, in approaching the crossing, to look and listen for approaching trains, and that the care required of him in this respect was the care which would be exercised by the ordinarily prudent person under such circumstances, having in mind the difficulty, if any, to see and hear an approaching train, the duty imposed upon defendants to give signals and warnings upon the approaching of the train to a railroad crossing, and all other matters shown in the evidence, etc. We have not given all of this instruction. The duty imposed

upon defendants to give signals was stated in other instructions. It is said that the verdict is contrary to Instruction No. 8, because, as appellants say, the evidence is undisputed that, if the plaintiff had done what this instruction requires, the accident would not have happened. This refers to matters about which the evidence was in conflict, and is disposed of by what we have before said. The principal objection to Instruction No. 9 is that it does not state that the alleged negligence, in regard to the failure to ring the bell, must have been the cause of the accident. The jury were so told in Instruction No. 3. The instructions must be considered together.

4. TRIAL: instructions: issues and theories in general: construction as a whole.

5. A part of Instruction No. 10½, as to the measure of damages, reads:

"In estimating the damages, if any, you will take into consideration the physical and mental pain, if any, he has sustained, by reason of such injuries, if any, and, if you believe from the evidence that his injuries, if any, are permanent, and that it is reasonably certain that he will hereafter suffer pain and anguish therefrom, then you will take this into consideration in estimating the damages, if any; however, you will exclude from your consideration any loss or impairment of earning power, if any, during plaintiff's minority."

One of appellants' objections to this is that there was no evidence of plaintiff's ability to labor or earn money for the future, or anything that would form a basis for the jury to allow for such injury, and that there was no evidence as to what he would or could earn after attaining his majority. Appellants argue that the jury may or could have inferred from the last clause in the instruction that they could allow damages for loss or impairment of earning power after plaintiff attained his ma-

5. TRIAL: instructions: form and language in general: earning power.

jority. We think this argument is not justified. The jury was told, in other parts of the instructions, what they could properly take into consideration. It may be true, and it is not contended otherwise by appellee, that the evidence does not show plaintiff's earnings. The evidence does show that plaintiff's leg had been broken, that his leg was shortened, and that his injuries are permanent. These conditions being shown, they would, of themselves, tend to impairment of plaintiff's earning power, even though there was no evidence as to the amount of his wages. However this may be, we think the instruction precluded any recovery for loss or impairment of earning power after plaintiff had reached his majority. The instruction as a whole authorized damages in the future for pain and anguish. At any rate, the instruction is right, as far as it goes. Appellants did not ask an instruction on this point.

A further objection, and the one most argued, is that it was error to instruct as to what pain or damages plaintiff might or may suffer. Appellants cite *Williams v. Clark County,* 143 Iowa 328, 329; *Ford v. City of Des Moines,* 106 Iowa 94, 96; *Escher v. Carroll County,* 159 Iowa 627, 637; and other cases. Clearly, the instruction in question is not vulnerable to the objection made; for it

6. TRIAL: instructions: issues and theories in general: pain or anguish suffered.

reads, "that it is reasonably certain he will hereafter suffer," etc.,—not what he may suffer. This is in harmony with the authorities. *Westercamp v. Brooks,* 115 Iowa 159; *Seitsinger v. Iowa City Elec. R. Co.,* 181 Iowa 739; *Woodworth v. Iowa Cent. R. Co.,* 170 Iowa 697.

6. Points are made by appellants, and errors predicated thereon, because of the refusal of the trial court to give defendants' requested instructions. This opinion is already too long, and we shall not take the time or space to notice these separately. It is enough to say that, in so far as the offered instructions stated correct propositions of law, they

were covered by the instructions given by the court. Some of the instructions given were in almost the same language as the requested instructions. The objections to some of such instructions are covered by the discussion in this opinion. All points made have been considered, and most of them have been discussed. No reversible error appears. The judgment is, therefore,—*Affirmed.*

LADD, C. J., EVANS and SALINGER, JJ. ,concur.