Bernard S. Meter, J.
Does any provision of the United States or New York State Constitution invalidate a school hoard resolution directing that as a daily procedure, following the salute to the flag, the following prayer be said in the schools of the district: ‘ ‘ Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country ”?
The attempt to find a commonly acceptable prayer is not new. Madison recorded “ a project of a prayer, by Governor *661 Livingston, father of the present Judge, intended to comprehend and conciliate college students of every Christian denomination, by a form composed wholly of texts and phrases of Scripture ’ ’ ;[1] and Benjamin Franklin wrote his own more generalized version of the Lord’s Prayer, with detailed explanation of the reasons for each change.[2] Nor is the problem of prayer in New York public schools novel. In a series of rulings beginning in 1837 and continuing until at least 1909, the Superintendent of Common Schools of the State of New York held that a “teacher might open his school with prayer, provided he did not encroach upon the hours allotted to instruction, and provided that the attendance of the scholars was not exacted as a matter of school discipline.”[3] The rationale of the policy is most clearly stated by Superintendent Spencer, in a decision rendered May 13, 1839,[4] as follows:
“ Both parties have rights; the one to bring up their children in the practice of publicly thanking their Creator for his protection, and invoking His blessing; the other of declining in behalf of their children, the religious services of any person in whose creed they may not concur, or for other reasons satisfactory to themselves. These rights are reciprocal, and should *662 be protected equally; and neither should interfere with the other. Those who desire that their children should engage in public prayer have no right to compel other children to unite in the exercise, against the wishes of their parents. Nor have those who object to this time, place or- manner of praying, or to the person who conducts the exercises, a right to deprive the other class of the opportunity of habituating their children to what they conceive an imperious duty. Neither the common school system, nor any other social system, can be maintained, unless the conscientious views of all are equally respected. The simple rule, so to exercise your own rights as not to infringe on those of others, will preserve equal justice among all, promote harmony, and insure success to our schools. In the present case, the Superintendent thinks the trustees had [1] awful right to permit the teacher to commence the business of the day by public prayer, with the children of such parents as desired it; and they were also right in directing that such exercises should not take place during school hours, nor form a part of school discipline.
*jr, Jf. W 7r
‘ ‘ And the teacher should allow the children of all parents who do not desire them to engage in prayer to withdraw from the room, or to absent themselves from it. But if they come into the room before the usual school hours, and choose to remain there during prayer, they must preserve the order and decorum befitting such an occasion.”
In 1951 this policy was altered when the Board of Regents adopted a statement of belief recommending the prayer quoted above with the suggestion that ‘ ‘ at the commencement of each school day the act of allegiance to the Flag might well be joined with this act of reverence to God.”[5] Respondent school board having followed the Regents’ recommendation and directed recital of the prayer, the question presented to this court is whether as a matter of power, rather than as a question of policy, it may legally do so? For the reasons hereafter set forth at length, it is concluded that the ‘ ‘ establishment ’ ’ clause of the Constitution does not prohibit the noncompulsory saying of the Regents’ prayer in the public schools, but that the “ free exercise ” clause requires that respondent board take affirmative steps to protect the rights of those who, for whatever reason, choose not to participate.
*663 The case arises as an article 78 proceeding, seeking an order in the nature of mandamus directing the respondent Board of Education of Union Free School District Number Nine, Town of North Hempstead, to discontinue use of the prayer. The five petitioners are taxpayers within the district and parents of children in schools of the district. Permission to intervene was asked by 16 taxpayer-parents who oppose the petition, and intervention was allowed pursuant to section 1298 of the Civil Practice Act, but limited in the court’s discretion to the merits of the constitutional questions under applicable provisions of the United States Constitution and the Constitution of the State of New York. The State Board of Regents did not seek to intervene but asked and without objection was granted, leave to file a brief amicus curice. The action of the board which is questioned is the adoption on July 8, 1958 of a resolution ‘ ‘ that the regents prayer be said daily in our schools ’ ’ and the direction, at the same meeting, by the board “to the District Principal that this be instituted as a daily procedure to follow the Salute to the flag ’ ’. The respondent Board of Education answered and moved to dismiss on a number of procedural grounds.
The Procedural Questions
First, it is claimed that since the matter “ can be adequately reviewed by an appeal to a court or to some other body or officer”, to wit — the Commissioner of Education, pursuant to section 310 of the Education Law, subdivision 4 of section 1285 of the Civil Practice Act precludes consideration of the instant petition. That section, however, is not controlling in a proceeding in the nature of mandamus “ ‘ to compel performance of a duty specifically enjoined by law ’ ’ ’,[6] nor even in what would normally be a discretionary matter if a constitutional issue is involved.[7] It is, therefore, unnecessary to rule on *664 petitioners ’ further contention that appeal to the Commissioner is not “ adequate.”[8]
The board next points to the fact that its resolution was adopted July 8, 1958, more than four months before the commencement (Jan. 22, 1959) of this proceeding, and says that the proceeding is, therefore, not timely brought. But since what is charged in the petition is a continuing failure to obey the requirements of the Federal and State Constitutions, and the proceeding was commenced within four months after the demand for. discontinuance, it is within the time allowed by section 1286 of the Civil Practice Act.[9]
Third, the board argues that a question of constitutionality must be raised in a plenary action rather than a special proceeding. This contention is based on the well-established rule that in a proceeding to review an application addressed to the discretion of an administrative body, petitioner is held to have conceded, for the purpose of the application, the constitutionality of the statute or ordinance under which the body acts.[10] But the application here is one involving performance of a constitutional duty, and that question is properly raised in an article 78 proceeding.[11]
Fourth, the board objects that petitioners are, in effect, seeking an injunction, which relief is not available in this proceeding. Of course, as the language of section 1284 (“ ‘ duty specifically enjoined by law ’ ” [italics supplied]) and the name (mandamus) of the former procedure imply, article 78 procedures encompass relief which might be ordered by a mandatory injunction. That fact alone will not put outside the scope of article 78 proceedings an action, such as the present one, seeking to compel the board to obey the command of specific constitutional provisions, and *665 thus within the express language of subdivision 3 of section 1284.[12]
Finally, it is claimed that the petition is defective and should be dismissed as a matter of law because it fails to allege (a) that the schools attended by petitioners’ children are within the school district and under control of respondent board, and (b) facts which establish that the board failed to perform a duty enjoined by law. With respect to the allegation of control, petitioners sought at the hearing permission both to reply and to amend their petition and have filed a reply containing the allegation said to be missing. Since the petition does not in haec verba make the allegation, the court in the exercise of the discretion with which it is clothed by section 1294 of the Civil Practice Act, grants the request to amend in order to obviate any question on the point,[13] although the fact is one that will be judicially noticed[14] and, therefore, need not be pleaded or proved.[15] Paragraph 4 of the petition is deemed amended by inserting at the end thereof the words: “All of the schools referred to in paragraph ‘ 2 ’ of this petition are within Union Free School District Number Nine and under the jurisdiction and control of Respondents.”, and the answers of respondents and intervenors are deemed answers to the petition as thus amended.
Whether the petition alleges facts sufficient to establish that. the board failed to perform a duty enjoined by law is largely dependent upon a determination of the constitutional duty imposed. For reasons hereafter set forth at length, it is held that while the board may authorize, it may not require, the saying of the prayer in question, but that if it does so, it must bring the authorization to the attention of parents of children in the schools, establish a procedure for excusing nonparticipants not only from saying the prayer but from the room, if they so elect, and take affirmative steps to protect the religious freedom of both nonparticipants and participants.
The petition alleges that the board by resolution directed that the prayer be said as a daily procedure and that it is being *666 said aloud each day in the schools of the district, that the saying of the prayer and the manner and setting in which it is said are contrary to the religions practices of those petitioners and their children who are believers and contrary to the beliefs concerning religion of those petitioners and their children who are nonbelievers, and that demand has been made for discontinuance of the prayer and refused by respondent board. What is alleged thus shows violations of constitutional duty in that (1) the board has required rather than authorized the daily use of the prayer, and (2) the manner of its being said does not protect the rights of nonbelievers or the religious scruples of all of the believers. What is. alleged is a “ due process ” rather than an ‘ ‘ equal protection ’ ’ question and it, therefore, is not necessary to allege or prove purposeful discrimination in administration of the resolution.[16] While a presumption of constitutionality might, in view of the absence of allegations of fact showing compulsion,[17] warrant the court in construing the board’s direction as being in fact only an authorization, such a presumption, if one exists in religion cases,[18] cannot supply the missing safeguards which the constitutional privilege of free exercise mandates. The petition states a cause of action, therefore.
The foregoing disposes of all of the board’s defenses except the sixth, which sets up the constitutional right of children other than petitioners’ to say the prayer free from interference, and of all procedural questions except petitioners’ motion for a jury trial and the determination of petitioners’ standing to sue. For reasons hereafter set forth the defense is held to be without merit and the motion for jury trial is denied.
Petitioners’ standing to sue is established by the Zorach case as a matter of both New York[19] and Federal[20] law. This *667 results not only from the fact that petitioners are parents of children who are currently attending the schools subject to the program but also from the fact that the prayer and the manner and setting in which it is said are contrary to the beliefs of petitioners and their children.[21] There will have been “actual interference”[22] with the religious , freedom of petitioners and of their children unless they are given notice of and an opportunity to make a conscious choice concerning participation in the prayer, and unless steps are taken to see that their freedom not to participate is respected.
Since it has been suggested that section 801 and section 3204 of the Education Law impose a duty on the Board of Regents, and that respondent board in requiring the prayer was only carrying out a duty imposed on it by the Regents, the legal status of respondent board should also be ascertained. The Board of Education of a union free school district exists as a separate body corporate.[23] As such it is distinct from the Board of Regents, which heads the Department of Education and which appoints, and at pleasure may remove, the Commissioner of Education.[24] The Commissioner of Education is the chief executive officer of the Board of Regents, enforces the laws relating to education, and carries out the policies of the Board of Regents.[25] Attendance of minors from 7 to 16 years of age upon full-time day instruction is compulsory[26] and instruction is required by statute in particular subjects.[27] Neither prayer nor religion is mentioned in the law, except that because of their religious beliefs, children may be excused, under regulations of the Regents, from attendance at health or hygiene education[28] and absence for religious observance and education must be permitted under rules established by the Commissioner.[29] The Regents must prescribe courses in patriotism and citizenship which must be attended by all pupils over eight years of. age, and in the history and meaning of the Declaration of Independence and the United States and New York Constitutions which must be attended by all pupils in the *668 eighth and higher grades.[30] The contention that respondent board acted in furtherance of the Regents’ directions issued under the foregoing provision cannot be sustained, however, for the provision speaks of ‘ ‘ patriotic and civic service ’ ’ and the fostering of “moral and intellectual qualities” whereas the documents issued by the Regents[31] concern themselves with not only those problems but also “spiritual training”. Further, those documents make no reference to the provision and are entitled ‘ ‘ Regents Statement ’ ’ and ‘ ‘ Regents ’ Recommendations ”, obviously not mandatory prescriptions. Further, the board’s answer, insofar as it relies on a direction that no child is to be required to join in the prayer, is inconsistent with such a contention, since the statute is compulsory and the Legislature made no provision for exception. Finally, neither the Regents’ Statement nor the board’s resolution makes the distinction that the statute does between children over and under the age of eight years. It follows, therefore, that the board’s resolution, though referring to and inspired by the Regents’ Statements, must be considered voluntary and that the Regents ’ policy and program set forth in those statements are involved in this decision only insofar as they form the background for and are referred to in the action of the board. In short, what is to be considered is the power of the board, unsupported by any administrative, legislative or constitutional requirement that it provide spiritual training or adopt the resolution of July 8, 1958.
The Constitutional Questions
We are brought then to a determination of the constitutional issues. The question is a close one, and since, as Mr. Justice Holmes observed the “ controversies are apt to be fierce in proportion to the nicety of the question ”,[32] a few general observations are, perhaps, in order. In the first place, a judge’s task in such a determination is “never [to] substitute his personal appraisal of the interests at stake, or his personal preference between them * * * [but rather] * * * to decide how those who have passed the ‘ enactment ’ would have dealt with the ‘ particulars ’ before him, about which they have said nothing whatever.”[33] Second, the emotionalism generated *669 by such controversies necessitates careful analysis of tbe arguments made in order to place them in proper perspective, to exclude purely policy matters and to reject in terrorem contentions made without substantial basis. Thus, the thesis that the present rate of juvenile delinquency evidences the need for prayer in the schools is a matter of policy and of no weight in determining what constitutional provisions framed in 1789 and 1865 mean.[34] So also while it may validly be argued that the appointment of chaplains by the Congress in 1791 represents a practical construction by the Congress responsible for the First Amendment of its meaning, the fact that the appropriation acts covering the pay of Congressional chaplains has never been held invalid is of no weight, since no citizen has standing to bring an action to prevent such a payment.[35] Again, Franklin’s suggestion to the Constitutional Convention of daily prayer as a means of breaking its deadlock assumes lesser proportion when it is realized that the suggestion, though seconded, was not adopted by the convention.[36] Similarly, to be rejected, in view of the essentially different nature of prayer on the one hand from the study of historical fact on the other, is the specter of “ Godless ” schools in which, if the prayer here involved is not sanctioned, references to God in the Constitution and the Declaration of Independence will not be permitted. In sum, the constitutional line to be drawn can only be determined by an analysis of the fact situation involved, the history of the constitutional provisions, and the holdings (together with but distinct from the language used in stating those holdings) of judicial decisions construing the constitutional provisions (or provisions essentially similar).

*670
The Fact Situation

The facts on which the constitutional determination is to be made encompass those drawn from the answer and answering affidavit as well as from the petition and reply.[37] For purposes of clarification, they are restated as follows: Petitioners are citizens, resident in Union Free School District Number Nine, whose children, pursuant to the Education Law, attend schools run by the district. Petitioners include members of the Jewish faith, of the Society for Ethical Culture,, of the Unitarian Church, and one nonbeliever. The respondent board on July 8, 1958, by majority vote resolved “that the regents prayer be said daily in our schools ” and “ gave direction to the District Principal that this be instituted as a- daily procedure to follow the Salute to the flag.” The prayer referred to, the words of which are set forth at the beginning of this opinion, originated in the Regents’ Statement on Moral and Spiritual Training in the Schools adopted November 30, 1951, which statement was supplemented by the Regents’ Recommendations for School Programs on America’s Moral and Spiritual Heritage adopted March 25, 1955.[38] It is said aloud at the commencement of the school day, by each class, in the classroom in the presence of a teacher. Though not specifically incorporated in the board’s resolution, or otherwise publicized, the board directed that no child was to be required or encouraged to join in the prayer against his or her wishes; only one’ request that a child be excused from saying the prayer was received in the schools of the district, which request was respected; and no child has directly asked to be excused from joining in the prayer nor has either a parent or a child sought permission for a child to leave the classroom during the saying of the prayer.[39] The saying of the prayer and the manner and setting in which it is said are contrary to the religion and *671 religious practices of those petitioners, and their children, who are believers, and to the beliefs concerning snch matters held by the petitioner, and his children, who are nonbelievers.[40] Petitioners have demanded that the saying of the prayer in the schools of the district be discontinued, which respondents have refused to do.

The Nature of Prayer and of the Instant Prayer

The first inquiry to which we are brought by the facts above found is the nature of prayer. The dictionary definitions include: “Act of addressing supplication to a divinity or object of worship; the offering of adoration, confession, supplication, thanksgiving, etc., to a God ”, “ [t]lie form of words used in praying”, “ [a] form of religious service or worship for public or common use, consisting largely of prayers; as, Morning or Evening Prayer ”.[41] The religious nature of prayer was recognized by Jefferson[42] and has been concurred in by theological writers,[43] the United States Supreme Court[44] and *672 State courts[45] and administrative officials,[46] including New York’s Commissioner of Education.[47] • A committee of the New York Legislature has agreed.[48]
The Board of Regents as amicus curia, the respondents and the intervenors all concede the religious nature of prayer, but seek to distinguish this prayer because it is based on our spiritual heritage. On this score, they argue that it is established that this is a religious nation, that many examples exist of the religious belief of the Founding Fathers, that the wording of the prayer in invoking ‘ ‘ Almighty God ’ ’, in acknowledging “ our dependence upon Thee ” and in asking “ Thy blessings ” is derived from national organic documents, that the prayer is to be said in conjunction with the Pledge of Allegiance and “as an incident to the Pledge of Allegiance ceremony ”, that it was recommended with the understanding that no child would be forced to say it, and that the recommendation was silent as to requirements respecting attire, posture, gestures and the like.[49] The argument proves too much, both as to “ establishment ” and “ free exercise ”. If it be assumed for the moment that the Constitution prohibits prescription of mode of worship and that, therefore, prayer may not be prescribed, the State’s interest in familiarizing students with the religious nature of our heritage would not justify the use of prayer as a vehicle for imparting that knowledge since there are other equally effective and constitutionally uninhibited means of achieving that end. If, on the other hand, *673 the purpose is to inculcate in pupils a love of God,[50] then as we shall hereafter see, as an exercise required of all pupils, it would constitute religious instruction in violation of the ‘ ‘ establishment ’ ’ clause and as a permissive exercise it would, unless it gives positive recognition to the right of any participating child to adopt any posture, use any gesture, wear any attire, use any language, or follow any other practice which his or her own religious beliefs may dictate, violate the ‘‘ free exercise ” clause of the Federal and State Constitutions, as well as the parent’s rights, hereafter discussed, under the due process clause to control the education of his child.
It is, however, also contended that the recognition of prayer is an integral part of our national heritage, and that, therefore, the “ establishment ” clause cannot have been intended to outlaw the practice in schools any more than from the rest of public life; that is, that prayer in the schools is permissible not as a means of teaching “spiritual values” but because traditionally, and particularly at the time of the adoption of the First and Fourteenth Amendments, this was the accepted practice. With this argument the court agrees. To spell out the reasons for this conclusion, however, requires reference to history.

The History of the Constitutional Provisions and of Public Education

Although the writings of Jefferson and Madison are often referred to on matters of constitutional interpretation, it was Jefferson’s view that in such matters one should “ recollect the spirit manifested in the debates, and * * * conform to the probable [meaning] in which it was passed ”[51] and Madison argued that “ It is the sense of the nation, therefore, not the sense of the General Convention, that is to be consulted; and that sense, if not taken from the act itself, is to be taken from the proceedings of the State Convention & other public indications as the true keys to the sense of the Nation.”[52] Unfortun *674 ately, as Story pointed out,[53] the varying interpretations presented in such State conventions makes them at best uncertain and inconclusive criteria. Generally, then, in construing the-Constitution, one must look to the history of the times and examine the state of things when the provision in question was adopted.[54]
The history of the adoption of the Fourteenth Amendment has been examined in three exhaustive studies.[55] While they show that Congressman Bingham and Senator Howard in debate indicated the purpose of the amendment to be to guarantee the personal rights protected by the first eight amendments against State action,[56] the Supreme Court has within the last few months once again refused to adopt this thesis,[57] and in any event these are general references, making no specific allusion to the guarantees concerning religion. The closest such was Bingham’s reference, in a speech accepting his renomination to Congress, to his part in framing the first section of the Fourteenth Amendment, which ‘ ‘ he said, placed the golden rule in the Constitution.”[58]
If we turn then from constitutional history to the history of the times, we find that by 1868, when the Fourteenth Amendment was ratified, “ the separation of public education from Church entanglements, of the State from the teaching of religion, *675 was firmly established in tbe consciousness of tbe nation ’ ’,[59] but tbat sucb separation did not extend to tbe exclusion of prayer or tbe reading of tbe Bible from public school routines. "While some of tbe State Constitutions then in force contained provisions forbidding sectarian instruction or the use of public funds for denominational schools, or both,[60] tbe schools were generally opened with prayer.[61] Massachusetts bad a law requiring tbe reading of tbe Bible in tbe schools,[62] and New York’s Superintendent" of Common Schools bad ruled no less than five times tbat prayer and Bible exercises could be conducted in tbe schools before school hours, but could not be made compulsory.[63] Only two cases dealing with tbe Bible in tbe schools bad reached tbe appellate courts; in both use of tbe Bible was allowed to continue, in one on tbe basis of its literary value, in tbe other, in part, because tbe regulation included provision for excuse.[64] Tbe controversy which began in tbe late 1830’s over religion in tbe schools and public support of parochial schools included as one of its facets mandatory Bible reading and prayers in tbe schools,[65] the Catholic minority seek *676 íng to exclude the Bible and prayer, the Protestant majority strenuously opposing such exclusion. The battle that followed saw the formation in 1864 of the National Association to Secure the Religious Amendment to the Constitution, an organization dedicated to having God and the Bible recognized in the Constitution,[66] and the counter organization of the Liberal League whose demands included the discontinuance of all religious instruction, and particularly use of the Bible in the schools.[67] The climax of the controversy came with President Grant’s 1875 address to the Army of the Tennessee inveighing against public support of sectarian schools[68] and his annual message of that year calling for an amendment requiring the States to maintain public schools and forbidding the teaching in them of religious, atheistic or pagan tenets.[69] This was followed in 1876 by the introduction of the Blaine Amendment, which would have incorporated that principle in the Federal Constitution, and the inclusion in the Republican party platforms of 1876 and 1880 of planks supporting Grant’s position.[70] Although the amendment was defeated in the Senate, its defeat was apparently not due tó opposition to its principle,[71] and was followed by adoption of similar provisions in the Constitutions of most, if not all, of the States which did not have such provisions, and in a Congressional requirement that newly admitted States include in their Constitutions a provision for maintenance of a school system free from sectarian control.[72]
Notwithstanding the strong current of opinion thus demonstrated, the history of the times shows that it did not extend to the exclusion of the Bible and prayer from the schools. Thus out of the New York phase of the battle came an 1844 Act of the Legislature prohibiting New York City’s Board of Education from excluding Bible reading, without note or comment, *677 but prohibiting it from directing which version should be read ;[73] its Massachusetts phase required Horace Mann, often referred to as the father of the American public school system, to defend himself against a charge that as Secretary of the State Board of Education, he sought to drive religion from the schools, with the denial ‘ ‘ that I have ever attempted to exclude religious instruction from school, or to exclude the Bible from school ”;[74] its national phases saw the rise of the Know-Nothings and the American Protestant Association, both bitterly anti-Catholic organizations,[75] the ensuing formation of the American Party and the adoption in 1855 by that party of a platform which favored maintenance of undenominational schools but declared that the Bible “ should not be excluded from the public schools ”,[76] and the inclusion in the Senate version of the Blaine Amendment of a specific provision that ‘1 This article shall not be construed to prohibit the reading of the Bible in any school or institution.”[77] And during all this period, McG-uffey’s Third Header, first published in 1837, revised in 1843,1853, 1878, 1896 and 1901, and widely used in schools throughout the United States over a period of 70 years,[78] included the Lord’s Prayer (though in slightly revised form, as a poem), an Evening Prayer and a Child’s Hymn. The conclusion is inevitable that in 1868, the “ sense of the nation ”, to revert to Madison’s phrase, could not be read as indicating, by ratification of the Fourteenth Amendment, the exclusion of the Bible or of prayer from the public schools.[79]
*678 Is there anything in the history of the First Amendment that might lead to a contrary conclusion? If we look at the history of the period in which Madison introduced his proposed amendments, we find that church establishments were still maintained in Massachusetts, Connecticut, New Hampshire, South Carolina and Maryland,[80] that education was largely a matter of church schools[81] and that, as would be expected under church aegis, prayer, and indeed religious instruction, were a regular part of school routine.[82] The fact that Madison’s fifth proposal, that “No State shall violate the equal rights of conscience ’ ’ failed of adoption ;[83] the various versions through which his fourth proposal, which became the First Amendment, passed;[84] and the language of the final provision that “ Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;” made it clear, and it was early so held,[85] that the First Amendment had no application to the States. The only phase of the history of the amendment related to prayer was the proposal, made in the Senate, that “ Congress shall make no law establishing articles of faith or a mode of worship ”. The attempt to thus limit the amendment was rejected, but indicates that even those who sought a limited form of restriction agreed that the prohibition against establishment extended to “ mode of worship,” which would include *679 prayer. One must conclude from the debates and the history, therefore, that the First Amendment’s relationship to prayer was general, in the sense that there should be no compulsion to recite a prescribed form of prayer, rather than specific, in the sense that the then existing routine of prayer should be excluded from the schools.
If we ignore the limits of constitutional history above set forth, and examine into the individual views of the Founding Fathers,[86] we are brought to no different conclusion. Thus, as we have noted above, Franklin both wrote his own version of the Lord’s Prayer and suggested the efficacy of daily public prayer to the Constitutional Convention. As concerns Madison, though in later life he changed his views,[87] he was a member of the committee of Congress which arranged for a Congressional Chaplain,[88] and served with Jefferson on the Board of Visitors of the University of Virginia which in its 1822 report and 1824 regulations permitted use of rooms in the main building for religious worship.[89] Jefferson, who thought the prescription of a day of prayer so far a violation of the First Amendment and the reserved powers of the States as to prohibit him from proclaiming a Thanksgiving Day, nonetheless provided in his 1817 draft of a bill to establish a public school system in Virginia only that “ no religious reading, instruction or exercise shall be prescribed or practiced, inconsistent with the tenets of any religious sect or denomination",[90] and also participated in the adoption (as did Madison) of the 1824 regulations for the Uni *680 versity of Virginia providing that ‘ ‘ students of the University will he free, and expected to attend religious worship at the establishment of their respective sects, in the morning, and in time to meet their school in the University at its stated hour ’ ’.[91] While the strength of view and breadth of vision of Madison’s famous Memorial and Remonstrance[92] and Jefferson’s Republican Notes on Religion[93] may be considered the core of thought embodied in the First Amendment,[94] there is nothing in any of those documents that indicates an intention on the part of either author to exclude the routine of prayer from the schools, provided only that that routine be not compulsory.

The Decisional Law

Since our conclusion must, then, be that neither the sense of the nation, the debates, nor the individual views of the framers proscribe prayer as the ceremonial opening of a school day, we turn to the decisional law. As above noted, the Supreme Court early adopted the position that the First Amendment did not apply to the States; until 1922, it continued to assert this view despite the passage of the Fourteenth Amendment.[95] It also, within four years after the ratification of the Fourteenth Amendment, decided in the Slaughter-House Cases[96] that the privileges and immuhities clause of that amendment did not include the rights set forth in the first eight amendments. Despite repeated assaults on that position, the court .continues to adhere to it.[97]
*681 Nonetheless, both the “free exercise”[98] and “establishment”[99] provisions of the First Amendment are now clearly applicable to the States. Though the early decisions so indicating relied on ‘1 free speech ’ ’ cases and referred to infringement of the ‘ ‘ liberty ’ ’ protected by the due process clause, most of the later cases speak of the ‘ ‘ First Amendment, made applicable to the states by the Fourteenth,” without spelling out how, and consider and construe the language of the First Amendment as though it were directly applicable. None of the cases makes mention of the limitation implicit in the language of the due process clause: ‘1 deprive any person of life, liberty or property, without due process of law.” We need not now consider whether every “establishment” would constitute a deprivation of liberty or what leeway the phrase ‘ ‘ without due process of law ” allows for the exercise of legislative discretion in State “ establishment ” cases,[100] for the court has established due process criteria (in other than religion cases to be sure, but which must nonetheless be considered applicable to such cases since the hypothesis is that they arise under the same clause) which must be held to exclude the school-prayer situation.
Thus, the court has held ‘ ‘ from the beginning and uniformly that the Due Process Clause of the Fourteenth Amendment does not apply to the States any of the provisions of the first eight amendments as such.”[101] Only those provisions apply which are ‘ ‘ implicit in the concept of ordered liberty ’,[102] and they are applied to prohibit action Avhich is “ repugnant to the conscience of mankind”[103] or which violates principles “so *682 rooted in the traditions and conscience of onr people as to be ranked as fundamental.”[104] While the concept of ordered liberty clearly includes freedom of religion, with respect to both “establishment” and “free exercise”, legislative permission for the noncompulsory public recital of prayer cannot be said to be repugnant to the conscience of mankind. Indeed, when one recalls the tradition of prayer in the schools both before and after the inaugration of the public school system, in the Congress[105] and in other “ deliberative bodies ” and “ conventions ”;[106] and can point not only to a resolution, passed by Congress on the day after it passed the proposal which became the First Amendment, calling for the designation of “ a day of public thanksgiving and prayer ’,[107] but also to recognition of that tradition going back to Plato[108] and Plutarch,[109] one must conclude that due process does not proscribe legislative permission to say a noncompulsory prayer in the schools. “ The traditions and habits of centuries were not intended to be overthrown when that [the Fourteenth] amendment was passed. ’ ’[110]
That public prayer does not fit the rubric of due process does not, however, dispose of the matter. Since the court has dealt with the religion problems presented to it as though the First Amendment were directly applicable to the States, we must ascertain the reach of its decisions with respect to prayer in *683 the schools. To do that we must also understand the relationship of the parent and the state to the education of the child.
Meyer v. Nebraska[111] invalidated a Nebraska statute that prohibited the teaching of a foreign language in any school below the eighth grade. Holding that the statute denied due process to both teachers' and parents, the court said that the Fourteenth Amendment protected the right “ to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.” Though the end, that all might know English, was desirable, it could not be coerced. Pierce v. Society of Sisters[112] held invalid, as a denial of due process to both private school operators and parents, an Oregon statute requiring that all children attend public school. The court’s decision made clear that the state may not “ standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state * * ”
Both the Meyer and the Pierce cases recognized, however, the right of the State to prescribe a minimum curriculum, and that right has been upheld against the claim of a parent who sought to send his child to a sectarian school where the secular minimum was not taught.[113] The parent’s right to control and direct his child has also been held subject to the state’s right to require military training at a state university,[114] and to intervene in the interest of health to require that the child be given proper medical attendance,[115] to compel vaccination,[116] or to prohibit the use of young children in evangelical work in violation of the child labor law.[117]
The rule thus to be adduced is that the parent has primary control over his child but that the state, if it acts for the general welfare or the welfare of the child and there is a substantial nexus between the action required and the end sought to be *684 attained, may exercise a paramount control. That is to say, the parent’s primary right of control over his child remains subject to the exercise of the State’s police power in a proper case.
Investigation of the decisions relating to religious freedom shows that the same rule applies: freedom of religion is a preferred [118] but not an absolute right, upon which the State may impose restrictions if the restrictions are reasonable in relation to the gravity of the danger against which they are intended to protect. Thus the court in ruling on rights to church lands in Virginia after the Revolution, held that the Virginia Constitution did not require abolition of all religious corporations and that “ the free exercise of religion cannot be justly deemed to be restrained by aiding with equal attention the votaries of every sect to perform their own religious duties ”.[119] Again, in Watson v. Jones,[120] in holding legal tribunals bound by decisions of church authority on matters of church law and discipline, the court recognized “ the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights ”. The proviso was applied in both Reynolds v. United States[121] and Davis v. Beason[122] to hold that polygamy is a crime despite religious belief to the contrary. In the latter case in explaining the scope and limitation of First Amendment rights, the court said: “ The first Amendment to the Constitution, in declaring that Congress shall make no law respecting the establishment of religion, or forbidding the free exercise thereof, was intended to allow every one under the jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose as may be approved by his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect. The oppressive measures adopted, and the cruelties and punishment inflicted by the governments of Europe for many ages, to compel parties to conform, in their religious beliefs *685 and modes of worship, to the views of the most numerous sect, and the folly of attempting in that way to control the mental operations of persons, and enforce an outward conformity to a prescribed standard, led to the adoption of the Amendment in question. It was never intended or supposed that the Amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society. With man’s relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with. However free the exercise of religion may be, it must be subordinate to the criminal laws of the country, passed with reference to actions regarded by general consent.as properly the subjects of punitive legislation.”[123]
The right thus recognized to adhere to and publicly to express religious beliefs extends to evangelization in the public streets,[124] in the sale of religious tracts, [125] and in public parks,[126] as well as in a company town.[127] In the field of education, it permits the Congress to expend Indian trust funds for the religious education of the Indians since otherwise their freedom of religion would be violated,[128] permits a Jehovah’s Witness child to attend school despite a refusal to salute the flag,[129] permits a parent to demand the release of his child for a religious holiday,[130] or, at least, is not violated when release is granted for such holidays.[131] It also is not violated when the Congress *686 recognizes the religious scruples of conscientious objectors by exempting them from the draft,[132] although clearly such an exemption is a matter of grace and not of constitutional requirement.[133] It does not, however, even on religious grounds, permit withdrawal of children from school in the face of a statute requiring attendance until age 16,[134] nor, as we have seen, sanction violation of a child labor ordinance, the refusal to give instruction in the minimum curriculum required by statute, nor refusal to take a course in military science at the state university.
If we turn our attention to the “ establishment ” clause, we find that the court has held that there is no constitutional impediment to Congressional repeal of a charter granted under territorial law to the Mormon Church,[135] that the draft exemption of conscientious objectors is not the making of a law respecting an establishment,[136] and that the amendment does not proscribe a contract between the Government of the District of Columbia and a hospital run by an order of Catholic Sisters but incorporated as a separate entity.[137] Its most important decisions on the subject, however, were in the field of education,[138] in Everson v. Board of Education,[139] Illinois ex rel. McCollum v. Board of Education[140] and Zorach v. Clauson.[141]
The Everson case held that a statute authorizing reimbursement of parents for expenditures for bus transportation of their children to school, including Catholic parochial schools, did not constitute an establishment, its purpose being merely to provide safe transportation and thus protect the general welfare. The decision included the now famous dictum that: “ The ‘ establishment of religion’ clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to *687 profess a belief or disbelief' in any religion. No person can be pnnisbed for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious áetivities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect ‘ a wall of separation between Church and State. ’ ’,[142] The McCollum case relied upon that dictum to invalidate a released time system under which pupils whose parents signed permission cards were given 30 or 45-minute periods of religious instruction on public school premises during school hours by teachers employed by religious organizations though subject to the approval of the public school superintendent. Nonparticipating children attended a regular class or a study hall during the released time period. The majority opinion refused to accept the argument that the First Amendment forbids only preference of one religion over another, not impartial governmental assistance to all, and held that since public buildings were being used for religious instruction and the state’s compulsory education system was used to help provide pupils for the program of instruction carried on by the separate religious sects, the program was unconstitutional. A concurring opinion, written by Mr. Justice Frankfurter, reviewed the history of education in colonial times and through the period in which the Fourteenth Amendment was. adopted and concluded that separtion of the state from the teaching of religion was the accepted principle, and that, by permitting such teaching on school time and property, pressure was put upon children to attend, and a feeling of separation was engendered. Only Justice Reed dissented.
The final decision, Z orach v. Claus on, was rendered four years later. During the intervening period a storm raged in legal and educational fields over the McCollum ruling.[143] The Zorach decision upheld the New York released time system. The court held that the First Amendment does not require separation in every respect, the question in each case being one *688 of degree. It emphasized the religious nature of our people and said that to refuse to accommodate the public service to their spiritual needs would be to prefer nonbelievers over believers. It pointed out that, since the children were released for instruction outside the school, neither religious instruction nor expenditure of public funds was involved and added that there was no evidence that coercion was in fact being used to force or persuade students to take religious instruction. Holding that “ [g]overnment may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. * * * It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction,”[144] the court concluded that a system whereby the public schools do no more than accommodate schedules to a program of outside religious instruction does not violate the amendment.
The Zorach decision constitutes a retreat from both Everson and McCollum: where Everson’s broad dictum, reaffirmed in McCollum, outlawed aid to all religions, Zorach recognized that government can, without violation, accommodate all religions; where McCollum invalidated an alliance between religion and the compulsory education system, Zorach upheld the same alliance, for the same purpose, though in a different place. The Everson holding, that the expenditure of tax funds for a general welfare purpose was not invalidated because religious groups also benefited, was extended by Zorach to validate minimal[145] use of the tax supported school system for a religious purpose, as an accommodation of the spiritual needs of our people. The McCollum holding, that religious instruction as a part of a compulsory school system is unconstitutional without regard to whether actual compulsion operates[146] was adhered to, but the fact situation in Zorach was held sufficiently different in degree to warrant sanction of the accommodation. This would appear to be the reverse side of the “free exercise” coin: *689 ‘ ‘ establishment ’ ’ prohibits any compulsion in matters of religion that operates directly on the individual, but prohibits indirect compulsion (as through the use of general tax funds for a religious purpose) only if the nexus between government and religion thus produced is too close. The democratic nature of our Government precludes the imposition of sanctions in the field of religion; the religion nature of the governed sanctions the inclusion of religion in the processes of democratic life; the dividing line between permitted accommodation and proscribed compulsion is a matter of degree, to be determined anew in each new fact situation.
Despite an apparent contradiction in terms, the First Amendment’s “establishment” and “free exercise” clauses clearly protect the nonbeliever as well as the believer in God. This is borne out by decisions of the Supreme Court, by utterances of the Founding Fathers and by a provision of the Constitution itself. Thus the Everson decision states that the First Amendment ‘ ‘ requires the state to be a neutral in its relations with groups of religious believers and non-believers ”,[147] the McCollum ruling protected the rights of an atheist, and the Zorach decision, by refusing to prefer ‘ ‘ those who believe in no religion over those who do believe ’[148] recognized but refused priority to the nonbeliever’s- right. The principle thus stated is implicit in the provision of article VI of the United States Constitution that “ no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States ’ ’. It also was the point of view of Jefferson and Madison. Thus, Jefferson stated in his Republican Notes on Religion[149] that “ it does me no injury for my neighbor to' say there are twenty Gods, or no God ’ ’ and Madison incorporated in the fourth point of his Memorial and Remonstrance the statement that: ‘ ‘ Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us. ’ ’ Indeed, the only suggestions to the contrary are the statement, in the course of debate on the First Amendment, by Representative *690 Huntington, that he hoped that the amendment would he made in such a way as to secure rights of conscience “hut not to patronise those who professed no religion at all ”,[150] and a concurring opinion stating that freedom “of” religion does not mean freedom “from” religion.[151] The opinion’s apothegm is true only in a most limited sense. Every individual has a constitutional right personally to he free from religion, but that right is a shield, not a sword, and may not be used to compel others to adopt the same attitude. Mr. Huntington’s remark may be construed as suggesting merely that nonbelievers are not to be preferred over believers. To the extent that it may be read as suggesting that nonbelievers have any lesser rights, it is inconsistent with the views of Madison and Jefferson referred to above and with the fact that, at the time that it was uttered, less than 20% of the population of New England (the best churched section of the colonies) had any formal connection with organized religion.[152] Such an isolated statement, nowhere shown to have been brought to the attention of those who ratified the amendment, cannot be considered the “ sense of the nation ’ ’.
The principles of decisional law so far considered have been stated in Federal cases concerned with the United States Constitution. Except for the few incidental references to prayer hereinbefore noted, however, nothing in those cases has related to prayer in the schools or the closely kindred subject of the Bible in the schools.[153] Before attempting to apply the rides so far adduced to the fact situation of the present case, State decisions relating to prayer, the Bible and baccalaureate services must be considered.
*691 The use of prayer in the schools either separately or together with the Bible has been upheld in ten[154] and struck down in seven[155] State decisions. Of the cases concerned solely with the reading of the Bible, nine[156] have upheld and two[157] have struck down Bible reading as a devotional exercise.[158] It has also been held that a school board may not be required to hold Bible reading exercises,[159] that school baccalaureate services and graduation exercises may be held in a church,[160] that the school system may not be used as a means of distributing religious pamphlets or Grideon Bibles,[161] and that a Board of Education may not display in the classrooms of its schools a plaque purporting to set forth the Ten Commandments.[162] Most of the above decisions have been made under State constitutional provisions prohibiting sectarian teaching. They conflict concerning whether the Bible or the Lord’s Prayer is sectarian. Many of the cases upholding such practice have pointed to the fact that the regulation involved did not make *692 it compulsory;[163] but regulations permissive in terms have been struck down because of the compulsion and discrimination involved in having to ask to be excused.[164]
Most of the decisions make no reference to the First and Fourteenth Amendments, a few make passing reference to them but rest decision primarily on State provisions,[165] only four discuss the effect of the amendments.[166] People ex rel. Vollmar v. Stanley held that under the Fourteenth Amendment children cannot be compelled, against their parents’ wishes, to take instruction not essential to good citizenship and that since the morality of the Bible could be taught by other methods, Bible reading was not essential and, therefore, could not be made compulsory. It then discussed, as a State constitutional question ‘ ‘ with which the United States Constitution has nothing to do,” whether Bible reading had to be excluded altogether. It concluded that noncompulsory reading of the Bible without comment was not sectarian, though the conclusion might be different if it were shown that sectarian sections of the Bible were read, and issued a writ requiring revocation of the order of compulsory attendance. Doremus v. Board of Education, held that under the applicable statute the practice of reading the Bible and reciting the Lord’s Prayer was permissive and not compulsive; that the sense of the First Amendment does not prohibit the recognition of God; and that the practice did not constitute sectarian instruction or worship or set up religious instruction or religious worship in aid of one or *693 more religions or constitute the establishment of religion or prohibit the free exercise of religion. Tudor v. Board of Education, decided by the same court, struck down the distribution of Gideon Bibles through the schools. The decision reviewed the history of the adoption of the First Amendment, and the religious motivation of the colonists, and held that the distribution of the New Testament constituted a religious preference in violation of the First Amendment. It distinguished the Doremus ruling and held the Gideon Bible to be a sectarian book. It further held that the practice involved could not be viewed as merely an accommodation, particularly in view of the testimony of psychiatrists that the effect of distribution under the authority of the school would be to create a subtle pressure on the child and to create tensions among religious groups. Finally, the Attorney General of the State of California has held that the First Amendment prohibits recitation of a prayer identical with the prayer involved in the instant case except that in place of the word ‘ ‘ parents ’ ’ it substituted the word “ home ”. His decision reviewed the Federal cases and concluded that a public school teacher may not be required to participate in such a prayer exercise[167] and that, in any event, the use of the prayer would be unconstitutional as a violation of the rights of the. children of atheist and agnostic parents. To require the children to participate in prayers contrary to the belief of their parents would, he held, be a material encroachment on the separation of church and state, and the right to be absent he considered an inadequate protection from the very real, though subtle, pressure which the indorsement of school and teacher would produce upon the child.
How do the above decisions and the principles to be drawn from them affect the instant case? The Zorach case holds that the Constitution does not require separation in every and all respects and, as we have seen, constitutional history confirms a tradition of prayer, including prayer in the schools. Even without the constitutional history, some form of prayer would appear to fall within the realm of permissible accommodation. Despite the board’s “ spiritual heritage ” argument, the prayer under consideration cannot be deemed religious instruction. It is recited during opening exercises rather than as a part of any instructional period. It is phrased in traditional prayer form rather than in any form normal for instructional materials. Essentially, it is devotional and, as such, is designed *694 to be repeated daily, without change, over a 12-year school course. Twenty-two words in length, and thus taking substantially less than one minute to recite and a good deal less time for recitation than does the legislative prayer deemed by Zorach to be within permissible constitutional degree, the instant prayer, at least when its recitation is limited to daily exercises at the opening of school, must be classified as outside McCollum’s proscription of religious instruction and within Zorach’s sanction as an accommodation.[168]
As Zorach recognizes, however, the prayer exercise would nonetheless be objectionable if there were direct compulsion. The board’s resolution of July 8, 1958, is framed in mandatory terms. While the answering affidavit states that direction has been given that no child shall be coerced or in any manner persuaded to participate, there is no indication that either the resolution or the direction has been brought to the attention of either the parents or the children. This is not a situation, such as pertained in the Zorach case, where prior parental consent has been obtained. In view of that fact and in view of the fact that a school child cannot be expected to understand that a resolution phrased in mandatory terms may be violated with impunity[169] or that such a child, not advised of his right to do so, will not normally be sufficiently aggressive to claim his constitutional privilege not to participate,[170] the court holds that the resolution of July 8, 1958, in its present form, is objectionable. The matter will, therefore, be remanded to the board for modification of its resolution to establish a procedure whereby the parents of each child are advised of the adoption of the resolution calling for the saying of prayer, of the wording of the prayer and of the procedure to be followed *695 when it is said and requested to indicate whether the child shall or shall not participate in the exercise.[171]
Since the matter is, therefore, to be remanded to the board, it is not necessary to hear petitioners’ evidence on the subject of coercion. In any event, to the extent that petitioners seek to rely on the pressure resulting from the school’s apparent sanction of prayer and from the necessity of applying for release from the exercise, as distinct from overt acts of the teachers or other school authorities, the evidence would not be material. To recognize “ subtle pressures ” as compulsion under the amendment is to stray far afield from the oppressions the amendment was designed to prevent;[172] to raise the psychology of dissent, which produces pressure on every dissenter, to the level of governmental force;[173] and to subordinate the *696 spiritual needs of believers to the psychological needs of nonbelievers. The equality of treatment which the amendment was designed to produce does not require, indeed proscribes, so doing.
This is not to say that the rights accorded petitioners and their children under the ‘ ‘ free exercise ’ ’ clause do not mandate safeguards against such embarrassments and pressures. It is enough on this score, however, that regulations, such as were adopted by New York City’s Board of Education in connection with its released time program, be adopted, making clear that neither teachers nor any other school authority may comment on participation or nonparticipation in the exercise nor suggest or require that any posture or language be used or dress be worn or be not used or not worn. Nonparticipation may take the form either of remaining silent during the exercise, or if the parent or child so desires, of being excused entirely from the exercise.[174] Such regulations must also make provision for those nonparticipants who are to be excused from the prayer exercise.[175] The exact provision to be made is a matter for decision by the board, rather than the court, within the framework of constitutional requirements. Within that framework would fall a provision that prayer participants proceed to a common assembly while nonparticipants attend other rooms, or that nonparticipants be permitted to arrive at school a few minutes late or to attend separate opening exercises, or any other method which treats with equality both participants and nonparticipants.[176]
*697 While for the reasons stated, the matter is to be remanded to the board, the court should also consider for the board’s guidance on remand the questions raised by petitioners with respect to divisiveness, sectarianism and the New York State Constitution. One of the purposes, it has been said, for adoption of the First Amendment was ‘ ‘ to keep bitter religious controversy out of public life by denying to every denomination any advantage from getting control of public policy or the public purse. ’ ’[177] Division over compulsory unification through public school programs was referred to in the Barnette decision [178] and the vital necessity to keep divisive forces out of the schools was argued in the McCollum concurring opinion[179] in considering whether the practices involved could be coerced. But what was involved in each situation was compulsion;[180] divisiveness and consciousness of religious differences have not been raised to the level of constitutional absolutes.[181] At most, division may be considered as one of many criteria to be used in determining whether a particular practice is within or without the Constitution. With respect to prayer, the constitutional history above reviewed shows a widespread tradition of prayer. And the existence of religious differences is one of the facts of life of which school children are every day made aware by absences for religious holidays, differences in clothing, in dietary habits and in other observances.[182] Religious tensions are part of everyday living and competition *698 among creeds is advantageous.[183] “ Our heterogeneous society •with its different religious groups demands the development of respect for differing points of view and for the right of others to believe differently.”[184] The genius' of the American experiment has been not a lack of difference in point of view, but absolute equality in matters of thought and belief despite all differences.
Petitioners contend, nonetheless, that there is not equality of treatment because the prayer is sectarian. Without analyzing in detail the meaning of the word “ sectarian ” as construed by the cases discussed above, it may be stated that the instant prayer which invokes “ Almighty God ” acknowledges “dependence ” upon Him and “ asks blessings ” cannot be considered sectarian in the sense that it prefers any particular sect. The fact that the prayer and the manner of its saying may not conform to all the tenets of the Jewish, Unitarian and Ethical Culture groups, or of any other group, does not mean that the prayer is sectarian. Nor can it be said in any true sense that the granting of legislative permission to say a prayer as an opening exercise in a school is a preference of believers over nonbelievers when the saying of the prayer is not made compulsory. To put it shortly, since each is free to follow his own predeliction with respect to prayer, to participate in a prayer exercise or to refuse to do so, the exercise cannot be deemed preferential.
For the same reason, that is, that the saying of the prayer is not made compulsory, the particular form of prayer adopted *699 by the respondent board in the instant case cannot be considered to be invalid as the prescription of a mode of worship. If it be admitted that the board may constitutionally permit the saying of a prayer as an opening exercise in a school, then it must either adopt a form of prayer or else leave to the discretion of the teacher or a student, if students are used to lead the exercise, the determination of what prayer is to be said. The latter procedure could, of course, result in the use in the schools of prayers identifiable as those of a particular sect, therefore preferential, and, therefore, prohibited. In order to prevent such a possibility and to seek the widest possible acceptance, the board may adopt a form of prayer so long as it does not adopt the prayer of any sect or a prayer sectarian in concept and does not make recitation of the adopted form compulsory.
This is not to say, however, that the board may be compelled to permit the saying of a prayer in the schools. The cases discussed above make clear that though the ‘ ‘ free exercise ’ ’ clause allows wide latitude to the individual in public expression of his belief and public demonstration of his worship, the freedom is not absolute. No sacred cow may impede the flow of traffic so necessary to the general welfare; no belief in polygamy, save the believer from prosecution. The state may determine the time and place, and within the limits suggested above, the manner of the exercise of such freedom, when it acts to protect its own legitimate interests or that of other citizens. The state may, therefore, in determining the curriculum of its schools, exclude any form of devotional exercise. It follows that the board’s affirmative defense that petitioners in seeking to interfere with the saying of the prayer by the children of others are acting in violation of the Federal and State Constitutions must be dismissed.
Petitioners’ final contention is that the saying of the prayer violates section 3 of article I of the State Constitution. That section reads as follows: “ The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; and -no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.” The language of the provision is no broader than the construction given the Federal “free exercise ” clause and the cases con *700 struing the State provision[185] are entirely consistent with the conclusion reached herein. And while section 4 of article XI of the State Constitution, which prohibits public aid to a school ‘ ‘ in which any denominational tenet or doctrine is taught ’ ’, has not been argued, the conclusion may be stated that since the instant prayer is not ‘ ‘ denominational ’ ’ that section would not exclude it.[186]
In summary, the petition, as amended, is held legally sufficient, the board’s defenses are held insufficient and are dismissed, the petitioners’ demand for a jury trial is denied for the reason that there is no triable issue of material fact, and the request for mandamus is, as a matter of discretion, denied[187] but the matter is remanded to the board for further proceedings not inconsistent with the foregoing. An order to that effect may be settled on notice.
The court wishes to thank all counsel for the excellent presentation not only in oral argument, but in the original and supplemental briefs. It is, perhaps, not amiss to conclude this opinion with the repetition of a sentence from the decision of Superintendent Spencer referred to in the beginning. Written 120 years ago, the following statement, in the court’s view, most completely conforms to the requirements of both constitutional law and of reason: “ The simple rule, so to exercise your own rights as not to infringe on those of others will preserve equal justice among all, promote harmony, and insure success to our schools.”

. Letter to Edward Everett, March 19, 1823, reprinted in Blakely, American State Papers on Religion (1943), 592. The Governor Livingston referred to was William Livingston, the first governor of New Jersey, who while he lived in New York had been a member of the Committee of Trustees for the Lottery Fund, from which Fund, King’s College (now Columbia University) was to be supported. In a series of newspaper articles, Livingston assailed the proposed college as an institution of the established church and pressed for a college under civil direction. He formulated his own plan under which “no religious profession in particular be established” and which would have prohibited any by-law relating to religion, except compulsion of church attendance on Sabbath. He urged that “the whole College be every morning and evening convened to attend public prayer * * * and that such forms be prescribed and adhered to, as all Protestants can join in.” When his opponents charged that no such prayer could be formulated, Livingston prepared and published in the Independent Befleetor of Thursday, May 31, 1753, the prayer Madison mentions. It is reprinted in part in Pratt, Annals Of Public Education In New York — -The Founding Of King’s (Afterwards Columbia) College (1873), 224-225. The history of the controversy is detailed in Mahoney, The Relation Of The State To Religious Education In Early New York, 1633-1825 (1941), 74-76.

. Cousins, In God We Trust (1958), pp. 21-23.

. New York State, Education Department, Superintendent of Common Schools, Annual Report 1912-1913, Part 2, pp. 524M532. The quotation is from Orders And Decisions, 6:391, referred to at ibid., p. 532. A decision by Superintendent Randall, dated October 27, 1853 in Matter of Quigley, not abstracted in the Annual Report, held that a teacher could not compel Catholic children to join in prayer or read the Bible.

. Orders And Decisions, 8:87, abstracted in op. cit., supra, n. 3 p. 526.

. ‘The Regents Statement on Moral and Spiritual Training in the Schools, adopted November 30, 1951. On March 25, 1955, this statement was supplemented by The Regents’ Recommendations for School Programs on America’s Moral & Spiritual Heritage.

. Matter of Leonard v. Horton, 278 App. Div. 62.

. Matter of Ellis v. Dixon, 118 N. Y. S. 2d 815, dismissed for failure to appeal to the Commissioner an article 78 proceeding seeking review of a School Board's refusal to permit use of the sehoolhouse, normally a discretionary matter. The Appellate Division affirmed, 281 App. Div. 987 (motion for leave to appeal denied 306 N. Y. 981, cert. dismissed 349 U. S. 458) holding that “The proceeding was properly before the court” but that the facts alleged did not show a clear legal right in petitioners or a failure by respondents to perform a duty enjoined by law. The holding accords with the line of eases reviewed in Benjamin on Administrative Adjudication in New York, Vol. 4 (Report on Educ. Dept.), pp. 51-54, of which Matter of O’Connor v. Emerson, 196 App. Div. 807, affd. without opinion 232 N. Y. 561 is illustrative, to the effect that the availability of review by the Commissioner does not bar article 78 review of action involving an interpretation of a statute and which is in violation thereof.

. The argument that the finality of the Commissioner’s determination prevents judicial determination of the constitutional question, thus making appeal to the Commissioner inadequate, is no longer valid in view of Matter of Ross v. Wilson, 308 N. Y. 605, and Matter of Ellis v. Allen, 4 A D 2d 343, appeal dismissed 4 N Y 2d 693, motion for leave to appeal denied 4 N Y 2d 674, permitting review, despite section 310 of the Education Law, of a determination of the Commissioner involving a constitutional question.

. Matter of Cash v. Bates, 301 N. Y. 258.

. Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton, 1 N Y 2d 508, 519, 520.

. People ex rel. Ferguson v. Vroman, 101 Misc. 233, affd. 180 App. Div. 914, revd. 222 N. Y. 586; Matter of McCabe v. Voorhis, 243 N. Y. 401; 22 Carmody-Wait, New York Practice, p. 200.

. Lewis v. Board of Educ. of City of N. Y., 258 N. Y. 117, 123; 22 CarmodyWait, New York Practice, p. 187. Matter of Donegan v. Patterson, 4 Misc 2d 81, cited by the board, appears distinguishable since no statutory or other duty was referred to.

. Lake Mohopac Heights v. Zoning Board of Appeals, 119 N. Y. S. 2d 809.

. People v. Wood, 131 N. Y. 617; Armstrong v. Cummings, 20 Hun 313.

. Shaw v. Tobias, 3 N. Y. 188; 3 Carmody-Wait, New York Practice, p. 472.

. Matter of Diocese of Rochester v. Planning Bd. of Town of Brighton, supra, n. 10, p. 521.

. The petition alleges in language substantially the same.as that used in the petition in Zorach v. Clauson, 343 U. S. 306, that the saying of the “ prayer and the manner and setting in whieh it is said have necessarily resulted in the exercise of coercion upon the children,” but this is a conelusory allegation and does not implicate the board. See 343 U. S. 306, 311, n. 7, cf. ibid., p. 321.

. See, e.g., Prince v. Massachusetts, 321 U. S. 158, 167, “It cannot be sustained by any presumption of validity.”

. Matter of Zorach v. Clauson, 303 N. Y. 161. The concurring opinion of Judge Desmond raises objections on the point whieh clearly do not apply to the instant case. See, also, Baer v. Kolmorgen, 14 Misc 2d 1015.

. Zorach v. Clauson, supra, n. 17, p. 309, n. 4, whieh distinguished Doremus v. Board of Educ., 342 U. S. 429. Accord: McCollum v. Board of Educ., 333 U. S. 203, 206.

. Note 66 Harv. L. Rev. 89, 120.

. United Public Workers v. Mitchell, 330 U. S. 75, 89.

. Education Law, § 1701; Judd v. Board of Educ., 278 N. Y. 200.

. N. Y. Const., art. V, § 4 and art. XI, § 2; Education Law, §§ 101, 201.

. Education Law, § 305', subd. 1.

. Ibid., § 3205. Sucb attendance may be at a public school or at a private or parochial school which meets the curriculum requirements established by the law. § 3204 (subd. 1).

. Ibid., §§ 3204, 801-810.

. Ibid., § 3204 (subd. 5).

. Ibid., § 3210 (subd. 1 [par. b], subd. 2 [par. b]).

. Ibid., § 801. Respondent relies also on section 1709 (subd. 5) read together with section 801. Since for the reasons given in the text, section 801 does not impose a duty, section 1709 (subd. 5) does not either.

. Supra, n. 5.

. Holmes-Polloek Letters (1941) Yol. I, p. 216.

. Hand, The Spirit Of Liberty (1952), 216.

. More in point would be the fact that Patrick Henry made the same argument in 1784 in support of the Bill Establishing a Provision for Teachers of the Christian Religion (Brant, James Madison, The Nationalist [1948] 344) that the initial passage of the bill by the Virginia Legislature provoked Madison’s famous Memorial and Remonstrance, and that, as a result, the assessment plan which the bill would have imposed was killed by the next session of the Legislature.

. Elliott v. White, 23 F. 2d 997. Likewise persons with standing may choose not to act for personal reasons, e.g. — Madison though he thought thanksgiving proclamations a “deviation from the strict principle ”, nonetheless “found it necessary to follow the example of his predecessors,” Letter to Edward Livingston, quoted in Stokes, Church And State In The United States (1950), Vol. I, p. 491, and it is hardly to be expected that the winner of a coveted appointment to one of the armed forces academies, or his parents, will institute aetion to declare unconstitutional the academy’s regulation covering compulsory chapel.

. Stokes, supra, n. 35, Vol. I, pp. 45A-455.

. Civ. Prae. Act, §§ 1291, 1292, 1295, 1296.

. Too long to set forth herein at length, hut such language therefrom as is directly pertinent -will he referred to in later portions of this opinion.

. The facts in the noted sentence are drawn from the affidavit of William J. Vitale, Jr., president of the board. The allegation of paragraph 10 of the petition that “ During the saying of the prayer, no student is permitted to leave the classroom,” is not inconsistent with the facts thus found, and petitioners have not availed themselves of the opportunity to controvert those facts in a reply affidavit. They are, therefore, taken as true.

. The facts found in the noted sentence are drawn from paragraphs 12 and 13 of the petition. While denied by both the board and the intervenors, religion and beliefs concerning religion are subjective matters into which the court cannot inquire, United States v. Ballard, 322 U. S. 78, revd. on other grounds after remand 329 U. S. 187; Fowler v. Rhode Island, 345 U. S. 67, 70, except, perhaps, to determine, whether the beliefs are held in good faith. Neither the board nor intervenors have denied petitioners’ good faith or ask for a trial of the question.

. Webster’s New International Dictionary (2d ed.).

. He refused to proclaim a day of thanksgiving on the ground that the First Amendment would be violated by his so doing. In his letter of January 23,1808 to Rev. Samuel Miller explaining his position, Jefferson stated: “ Fasting & prayer are religious exercises. The enjoining them an act of discipline. Every religious society has a right to determine for itself the times for these exercises, & the objects proper for them, according to their own particular tenets”. Writings Of Thomas Jefferson (Ford ed.) Vol. IX, p. 175.

. Fosdick, Meaning Of Prayer (1916), 32, describes prayer as “communion with God”; Heiler, Prayer (1932), 362, concurs in this definition and concludes that “prayer is the centre of religion.” A medieval proverb tells us that “Prayer without devotion is like a body without a soul”, Union Prayer Book (1940), Vol. I, p. 4.

. Fowler v. Rhode Island, supra, n. 40, p. 70: “ Sermons are as much a part of a religious service as prayers”; United States v. Ballard, supra, n. 40, p. 87: “ the power of prayer * * * deep in the religious convictions of many”; Holy Trinity Church v. United States, 143 U. S. 457, in which in expounding the thesis that this is a religious nation the court referred (p. 471) to “the custom of opening sessions of all deliberative bodies and most conventions with prayer”.

. Agreeing that prayer is a religious exercise, religious worship, part of religion: Spiller v. Inhabitants of Woburn, 94 Mass. 127; Moore v. Monroe, 64 Iowa 367; State ex rel. Weiss v. District Bd. of School Dist. No. 8 of Edgerton, 76 Wis. 177; State ex rel. Freeman v. Scheve, 65 Neb. 853; State ex rel. Freeman v. Scheve, 65 Neb. 876; Hackett v. Brooksville Graded School Dist., 120 Ky. 608; People ex rel. Ring v. Board of Educ., 245 Ill. 334; Herold v. Parish Bd. of School Directors, 136 La. 1034; State ex rel. Finger v. Weedman, 55 S. D. 343.

. 1909-1910 Atty. Gen. (Wash.) 135; 25 Cal. Ops. Atty. Gen. 316 (1955).

. Matter of Dargin, 72 N. Y. St. Dept. Rep. 27 (1951), which held that a baccalaureate service could not be held in the schools because “ a religious service”. The decision noted, however, that this was not intended to prohibit the opening and closing of school functions with customary invocation and benediction. The decisions of the Commissioner’s predecessor referred to in note 3 (supra) are based on recognition of the religious nature of prayer.

. Blau, Cornerstones Of Religious Freedom In America (1949), 136ff. recounts a controversy over payment of a legislative chaplain ending in a report in 1832 stating (p. 146) “Prayer is not a civic, but religious duty.” The provision for payment was repealed the next year.

. The burden of the argument is set forth in the Statement and Recommendation referred to in note 5 (supra), and those documents contain many historical examples.

. The Statement speaks of the prayer as “ this act of reverence to God ” and of the school’s function of “ ever intensifying in the child that love for God, for parents and for home which is the mark of true character training.” Of course, respondent board is not bound by the Statement.

. Letter of June 12, 1823 to William Johnson, The Writings Of Thomas Jefferson, (Ford ed.), Vol. S, p. 231.

. Fleet, Madison’s “Detached Memoranda ”, 3 Wm. & Mary Quarterly Hist. Mag. (3rd Ser.) 534, 544. On this ground Maxwell v. Dow, 176 U. S. 581, 601, rejected statements in Senate speeches on the passage of the Fourteenth Amendment offered to prove that the first eight amendments of the Bill of Rights had been incorporated in that amendment.

. Commentaries On The Constitution (1833), 406.

. Rhode Island v. Massachusetts, 12 Pet. (37 U. S.) 657, 723. So in Reynolds v. United States, 98 U. S. 145, the Supreme Court turned to the history of the times to ascertain the meaning of “ religion ” as used in the First Amendment.

. Flack, Adoption Of The Fourteenth Amendment (1908); Fairman, Does The Fourteenth Amendment Incorporate The Bill Of Rights ?, 2 Stan. L. Rev. 5; James, The Framing Of The Fourteenth Amendment, Illinois Studies in Social Sciences, Vol. 37 (1956).

. Flack, supra, n. 55, pp. 80, 84, 86.

. Bartkus v. Illinois, 359 U. S. 121, decided March 30, 1959, in which the court stated (p. 124): “ The relevant historical materials * * * demonstrate conclusively that Congress and the members of the legislatures of the ratifying States did not contemplate that the Fourteenth Amendment was a 'short-hand incorporation of the first eight amendments making them applicable as explicit restrictions upon the States.”

. James, supra, n. 55, p. 160. The speech was made August 10, 1866. In it Bingham gave as an example that men in Georgia would not be imprisoned, as they had been in the past, for teaching the Bible. In debate on the bill to implement the Fourteenth Amendment, Bingham was somewhat more specific as to his intentions (Cong. Globe, 42nd Cong., 1st Sess., App. pp. 83-85), but this was on March 31, 1871, long after the amendment had been ratified. Brown v. Board of Educ., 347 U. S. 483, 490 notes also that there is “ little in the history of the Fourteenth Amendment relating to its intended effect on public education.”

. Mr. Justice Frankfurter, concurring in the McCollum case, supra, n. 20, p. 217. He referred to 1875, when President Grant’s speech brought the matter to a head nationally, but it was equally true in 1868. The status of public education at the time the amendment was adopted is also footnoted in Brown v. Board of Educ., supra, n. 58, p. 489, n. 4.

. The State constitutional provisions and their adoption dates are tabled in O’Neill, Religion And Education Under The Constitution (1949), 140ff. and Cubberley, Public Education In The United States (1919), 180. The latter lists 14 States with such provision by 1868. Bible reading and prayer may, of course, infringe such a State provision, see eases cited infra notes 154-158, and if compulsory will also, as is hereafter demonstrated, violate the First and Fourteenth Amendments.

. Beale, A History Of Freedom Of Teaching In American Schools (1941), 95.

. Johnson & Yost, Separation Of Church And State (1948), 33. It should' be noted that almost the entire Legislature and administration elected in 1854 were Know-Nothings, Billington, The Protestant Crusade (1938), 412.

. Op. cit., supra, n. 3.

. Donahoe v. Richards, 38 Me. 379 (1854); Spiller v. Inhabitants of Woburn, supra, n. 45 (1866). A Boston Police Court ease which attracted wide enough attention to cause its reprinting in separate pamphlet form and in a Pennsylvania legal publication, Commonwealth on Complaint of Wall v. Cooke, 7 Am. L. Reg. 417 (1859), exonerated from liability for criminal assault a teacher who beat with a rattan stick a Catholic child who refused, on instruction of his father and his priest, to say the Lord’s Prayer or repeat the Ten Commandments.

. Connors, Church State Relationships In Education In The State Of New York (1951), 56. .Connors records, (p. 76), that the Catholic Second Plenary Council of Baltimore in 1866 enjoined pastors to keep watch “ lest their Catholic children use Protestant versions of the Bible, sing sectarian hymns, or recite prayers in the schools.”

. Lardner, How Far Does The Constitution Separate Church And State, 45 Am. Pol. Sci. Rev. 110-120'; Blau, op. cit., supra, n. 48, at 203.

. Blau, supra, n. 48, at 208.

. Stokes, supra, n. 35, sets forth the address (Yol. II, p. 722) and notes the editorial comment of the Catholic World, which reported the address, that this meant no support to the then system of common schools, “ because they are sectarian.”

. 4 Cong. Ree. 175.

. Lardner, op. cit., supra, n. 66, p. 121, where it is also noted that the Democrats affirmed adherence to the principle of separation but opposed the Republican proposal as invading States’ rights.

. Pfeffer, Church, State And Freedom (1953), 131, explains the defeat as partly partisan and partly resulting from the belief that State constitutions adequately dealt with the question. See also Justice Frankfurter concurring in McCollum v. Board of Educ., supra, n. 20, 219, n. 6.

. Ibid., and see O’Neill and Cubberley, loc. cit., supra, n. 60.

. Chapter 320 (§ 12) of the Laws of 1844, which became section 1151 of the Greater New York City Charter and was the subject of Lewis v. Board of Education, infra, n. 148.

. Culver, Horace Mann And Religion In The Massachusetts Public Schools (1929), 204; compare Pfeifer, supra, n. 71, at 285.

. Stokes, supra, n. 35, Vol. I., p. 829ff., 833ff.; Pfeffer, supra, n. 71, 374ff.; Sweet, The Story Of Religion In America (1930), 394.

. Greene, Religion And The State (1941), 110.

. 4 Cong. Ree. 5453, see also Meyer, The Blaine Amendment and the Bill of Rights, 64 Harv. L. Rev. 939.

. Vail, History Of The McGuffey Readers (1911).

. Butts, American Tradition In Religion And Education (1950), 137, Bates, Religious Liberty (1945), 92, and Stokes, supra, n. 35, Vol. II, p. 493, record the variations in legal requirements and consequent doubt concerning Bible reading and prayer in the schools. The situation in 1870 is graphically illustrated by the delivery in New York City, and publication in pamphlet form, in that year of sermons for (Boole, Our Bible, Our Schools And Our Flag, One And Inseparable) and against (Spear, The Bible In The Public Schools) the Bible in the schools, and the publication in that year by a former New York Supreme Court Justice of a book proposing an amendment to the Federal Constitution (Hurlbut, Secular View Of Religion In The State), one of his aims being the exclusion of the Bible and prayer from the schools {ibid., p. 46).

. Zollman, American Church Law (1933) 4, and Stokes, supra, n. 35, Yol. I, p. 433 both include South Carolina; Pfeffer, supra, n. 71, p. 126, does not. All were multiple establishments. It was not until 1833 that the last establishment, in Massachusetts, was terminated. Greene, supra, n. 76, p. .94.

. The history of colonial education was developed by Mr. Justice Frankfurter in his McCollum concurring opinion, supra, n. 20, pp. 213-215, and is also recorded in Cubberley, supra, n. 60, pp. 44, 53; Pfeffer, supra, n. 71, at 274; Keller, All God’s Children (1953), 277ff.; Bates, supra, n. 79, 210ff.; Stokes, supra, n. 35, Yol. II, p. 45ff.

. Stokes, supra, n. 35, Yol. II, p. 53; Lardner, supra, n. 66, p. 122; Cubberley, supra, n. 60, p. 28; Connors, supra, n. 65, pp. 2-4, 14; Pfeffer, supra, n. 71, p. 278.

. Dumbauld, The Bill Of Bights And What It Means Today (1957), 46, 207.

. Dumbauld, ibid., 39, 45, sets forth the history with appropriate references to the Annals of Congress and the Journal of the Senate, and in separate Appendices reprints the amendments as offered by Madison, as reported by the Select Committee, as passed by the House, as passed by the Senate and as agreed to after conference and finally proposed to the States. See, also, Perry, Sources Of Our Liberties (1959), 422^425; Stokes, supra, n. 35, Yol. I, 538-548; Sullivan, Religious Education in the Schools, 14 Law and Cont. Pro. 92, 106ff.

. Permoli v. Municipality No. 1 of City of New Orleans, 3 How. (44 U. S.) 589, 609, decided in 1845 first applied the principle to the religion provisions. Barron v. Mayor & City Council of Baltimore, 7 Pet. (32 U. S.) 243, decided in 1833, had held that the Bill of Rights was not intended to restrain the States.

. Mr. Justice Jackson called such materials “as enigmatic as the dreams Joseph was called upon to interpret for Pharaoh ”. Youngstown Co. v. Sawyer, 343 U. S. 579, 634.

. In the “ Detached Memoranda ”, he took the position that both legislative and service chaplains were violations of the Constitution, but could be considered de minimus, Fleet, op. cit., supra, n. 52, at 558-560.

. Brant, James Madison, Father Of The Constitution (1950), 272, which however is careful to note that this was in 1789, before there was a constitutional provision.

. Butts, supra, n. 79, p. 119, which, however, notes that on April 21, 1825, Jefferson wrote a letter refusing permission to hold religious services in a University building, which apparently overlooked the 1824 regulations. Madison in an 1824 letter spoke of the use of a public hall for religious exercises which students were free to attend or not as they chose, and said that it presented some difficulties but seemed the best plan of escaping the problem of theological professorships, Brant, Madison: On Separation of Church and State, 8 Wm. So Mary Quarterly Hist. Mag. (3rd Ser.) 3, 20.

. Italics supplied. The language is from section 11 of Jefferson’s 1817 “Bill for Establishing a System of Public Education”, which is reprinted in Honeywell, Educational Works Of Thomas Jefferson (1931), 235. The bill yyas not enacted (ibid., 65). •

. Ibid., 274.

. Which is reprinted in Blakely, supra, n. 1, p. 83, and as an appendix to Mr. Justice Rutledge’s dissent in Everson v. Board of Education, 330 U. S. 1, 66.

. Which reprinted, in 1803, that portion of Notes On The State Of Virginia (1784) relating to religion (Query XVII) together with the Act for Establishing Religious Freedom. Both are also set forth in Padover, The Complete Jefferson (1943), 673 and 946, and Blau, supra, n. 48, pp. 74, 76.

. See Levitan, Mr. Justice Rutledge, 34 Va. L. Rev. 526, 533-535; Reynolds v. United States, supra, n. 54, p. 164.

. Prudential Ins. Co. v. Cheek, 259 U. S. 530, decided in that year, held that (p. 543) “neither the Fourteenth Amendment nor any other provision of the Constitution of the United States imposes upon the States any restrictions about ‘ freedom of speech ’ ”,

. 16 Wall (83 U. S.) 36.

. Mr. Justice Stone, in Hague v. C. I. O., 307 U. S. 496, 521, n. 1, refers to over 50 attempts, up to 1935, to upset the rule of the Slaughter-House Cases. Mr. Justice Frankfurter concurring in Adamson v. California, 332 U. S. 46, 61, referred to “ the mischievous uses to which that clause would lend itself if its scope were not confined ”,

. Meyer v. Nebraska, 262 U. S. 390 (dicta); Hamilton v. Regents, 293 U. S. 245, 261; Cantwell v. Connecticut, 310 U. S. 296, 303; Minersville Dist. v. Gobitis, 310 U. S. 586, 593; Chaplinsky v. New Hampshire, 315 U. S. 568, 571 (dicta); Jones v. Opelika, 316 U. S. 584, revd. on rehearing 319 U. S. 103; Murdock v. Pennsylvania, 319 U. S. 105, 108; Board of Educ. v. Barnette, 319 U. S. 624, 639; Prince A. Massachusetts, supra, n. 18, p. 164 (dicta); Marsh v. Alabama, 326 U. S. 501, 504; Fowler v. Rhode Island, supra, n. 40.

. Everson v. Board of Educ., supra, n. 92, p. 8; McCollum v. Board of Educ., supra, n. 20, p. 210; Zorach v. Clauson, supra, n. 17, p. 309.

. Wilkinson, The Federal Bill Of Rights And The Fourteenth Amendment, 26 Geo. L. J. 439; Snee, Religious Disestablishment And The Fourteenth Amendment, 1954 Wash. U. L. Q. 371; Sutherland, Due Process and Disestablishment, 62 Harv. L. Rev. 1306; Warren, The New ‘‘Liberty” Under The Fourteenth Amendment, 39 Harv. L. Rev. 431; Note, 67 Harv. L. Rev. 1016; Corwin, The Supreme Court As National School Board, 14 Law & Contemp. Prob. 3. Professor Sutherland’s views were further expounded before the American Council on Education and are reprinted in its 1957 report: The Study Of Religion In Public Schools; see, also, Pfeifer, supra, n. 71, p. 129.

. Bartkus v. Illinois, supra, n. 57, p. 124.

. Palko v. Connecticut, 302 U. S. 319, 325.

. Ibid., p. 323.

. Snyder v. Massachusetts, 291 U. S. 97, 105.

. Zorach v. Clauson, supra, n 17, p. 312.

. See Holy Trinity Church v. United States, supra, n. 44.

. The Senate concurred in the amendments and their being sent to the States on September 25, 1789, Annals Of Congress, Vol. I, col. 88, and concurred in the thanksgiving resolution on September 26, 1789, ibid., col. 90. Objection was made that the resolution covered “ a religious matter, and, as such, is proscribed to us”, ibid., col. 915. Lincoln, Constitutional History Of New York (1906) 491, details the resolution of the Constitutional Convention of 1777, directing that August 27 of that year be observed throughout the State “as a day of fasting, humiliation and prayer ”.

. Timaeus: “All men, Socrates, who have any degree of right feeling, at the beginning of every enterprise, whether small or great, always call upon God ”, Great Books Of The Western World (1952), Vol. 7, p. 447.

. Against Colotes The Epicurean, 31, § 1135E: “ a city wihout temples and without gods, making no use of prayer or oaths or divinations, nor sacrifices to obtain blessings or avert evils, there is no one, nor ever will he who has seen.” Quoted by Stokes, supra, n. 35, Vol. I, p. 70.

. The quotation is from Holmes’ opinion in Interstate Ry. Co. v. Massachusetts, 207 U. S. 79, 87, a due process “ property ” case which is otherwise not in point. See, also, Frank v. Maryland, 359 U. S. 360, 371: “ * * * what free people have found consistent with their enjoyment of freedom for centuries is hardly to be deemed to violate due process”.

. Supra, n. 98, p. 399.

. 268 U. S. 510.

. People v. Donner, 199 Misc. 643, affd. 278 App. Div. 705, affd. 302 N. Y. 857, appeal dismissed 342 U. S. 884. Parents may, however, educate their children at home if curriculum and teaching standards are met. People v. Turner, 277 App. Div. 317.

. Hamilton v. Regents, supra, n. 98; see, also, Board of Educ. v. Barnette, supra, n. 98, 632.

. People v. Pierson, 176 N. Y. 201, cited with approval in Prince v. Massachusetts, supra, n. 18, 167.

. Jacobson v. Massachusetts, 197 U. S. 11.

. Prince v. Massachusetts, supra, n. 18.

. “ Preferred ” in the sense that it is guaranteed by the Bill of Rights. The decisions conflict concerning whether freedom of religion is preferred over other constitutionally guaranteed rights.

. Terrett v. Taylor, 9 Cranch (13 U. S.) 43, 49. This decision, rendered in 1815 by Justice Story, is apparently the first touching on religious freedom.

. 13 Wall. (80 U. S.) 679, 728.

. Supra, n. 54.

. 133 U. S. 333.

. Ibid., pp. 342-343.

. Cantwell v. Connecticut, supra, n. 98; Jamison v. Texas, 318 U. S. 413; Largent v. Texas, 318 U. S. 418; see Kunz v. New York, 340 U. S. 290.

. Jones v. Opelika, 319 U. S. 103; Murdock v. Pennsylvania, supra, n. 98; Follett v. McCormick, 321 U. S. 573.

. Fowler v. Rhode Island, supra, n. 40; Niemotko v. Maryland, 340 U. S. 268. The latter decision was based on equal protection rather than religious freedom, however.

. Marsh v. Alabama, 326 U. S. 501.

. Quick Bear v. Leupp, 210 U. S. 50.

. Board of Educ. v. Barnette, supra, n. 98. The decision overruled Miners-ville Dist. v. Gobitis, supra, n. 98, which had held the governmental interest in maintaining national unity paramount.

. Matter of Zorach v. Clauson, supra, n. 19, p. 173. Compare, however, Ferriter v. Tyler, 48 Vt. 444 holding that a Catholic child could be expelled for refusal to attend on Corpus Christi Day, and Commonwealth ex rel. School Dist. of Pittsburgh v. Bey, 166 Pa. Superior Ct. 136, upholding the conviction for violation of the compulsory education law of a Mohammedan parent who kept his child out of school on Friday.

. Zorach v. Clauson, supra, n. 17, p. 313.

. Selective Draft Law Cases, 245 U. S. 366.

. United States v. Macintosh, 283 U. S. 605, 623.

. Commonwealth v. Beiler, 168 Pa. Superior Ct. 462.

. Mormon Church v. United States, 136 U. S. 1.

. Selective Draft Law Cases, supra, n. 132.

. Bradfleld v. Roberts, 175 U. S. 291.

. Hamilton v. Regents, supra, n. 98, concerned education and includes a dictum by Mr. Justice Cardozo that requiring military instruction at a State university does not violate the “ establishment ” elause.

. Supra, n. 92.

. Supra, n. 20.

. Supra, n. 17.

. Supra, n. 92, pp. 15-16. It bad earlier been decided in Cochran v. Board of Educ., 281 U. S. 370, that a state could make secular textbooks available to both public and parochial schools, but the First Amendment issue was not raised in that case.

. See Mr. Justice Black’s dissent, 343 U. S. 306, 317 and his notes 1 and 2.

. 343 U. S. 306, 314.

. The court noted both that the cards were printed by the religious organizations (p. 309) and that the school’s truancy system was not used to enforce attendance (p. 311, n. 6).

. The court found it unnecessary, in view of its conclusion, to consider whether actual pressure existed, 333 U. S. 203, 207, n. 1. The trial court had found as a fact that it did not, Sutherland, supra, n. 100, 62 Harv. L. Rev. 1306, 1313, citing McCdllum Record, p. 69. The court did not emphasize the sectarian nature of the instruction, though Justice Douglas, in An Almanac Of Liberty (1954), 261, calls the use of public school rooms and machinery for such instruction “ the fatal feature ”.

. 330 U. S. 1, 18.

. 343 U. S. 306, 314. The principle was also recognized in the Gobitis ease, supra, n. 98, p. 593, in Plywacki v. United States, 205 F. 2d 423, which reversed, on the government’s confession of error, the District Court’s refusal to naturalize an atheist, in Lewis v. Board of Educ., 157 Misc. 520, 526, mod. 247 App. Div. 106, appeal dismissed 276 N. Y. 490 and in Matter of Lewis v. Allen, 5 Misc. 2d 68.

. Supra, n. 93. See, also, his Notes on Locke, reprinted in The Papers Of Thomas Jefferson (Boyd ed.) Yol. I, p. 548.

. Annals of Congress, Vol. I, col. 731; see, also, Stokes, supra, n. 35, Vol. I, p. 543.

. Gordon v. Board of Educ., 78 Cal. App. 2d 464, review denied by the California Supreme Court; see Pfeffer, supra, n. 71, p. 341.

. Sweet, Religion In Colonial America (1942), p. 335; See, also, Stokes, supra, n. 35, Vol. I, p. 229, wbicb cites an article by Sweet giving the overall figure as 1 in 8, and another by Davis putting the ratio at 1 in 20 to 25; and Cobb, The Rise Of Religious Liberty In America (1902), 16.

. Doremus v. Board of Educ., supra, n. 20, dismissed for want of standing an appeal from a judgment upholding reading of the Bible in New Jersey schools; Tudor v. Board of Educ., 348 U. S. 816, denied certiorari with respeet to a New Jersey judgment holding unconstitutional the distribution of Gideon Bibles through the schools; Washington ex rel. Clithero v. Showalter, 284 U. S. 573, dismissed appeal with respect to a judgment holding that the schools could not be required to hold opening Bible reading exercises. The Bible question under a compulsory statute is now before a three-judge Federal Court in Philadelphia for decision, in Schempp v. School Dist. of Abington Township, New York Times, March 13, 1959, p. 14, col. 2.

. Spiller v. Inhabitants of Woburn, supra, n. 45; Moore v. Monroe, supra, n. 45; Billard v. Board of Educ., 69 Kan. 53; Church v. Bullock, 104 Tex. 1; Hackett v. Brooksville Graded School. Dist., supra, n. 45; Knowlton v. Baumhover, 186 Iowa 691; Wilherson v. City of Rome, 152 Ga. 762; Doremus v. Board of Educ., 5 N. J. 435, appeal dismissed 342 U. S. 429; Commonwealth v. Renfrew, 332 Mass. 492; Carden v. Bland, 199 Tenn. 665. Cases such as North v. Board of Trustees, 137 Ill. 296 upholding compulsory chapel at a State university are not included since a college education is not compulsory.

. State ex rel. Freeman v. Scheve; People ex rel. Ring v. Board of Educ.; Herold v. Parish Bd. of School Directors, all supra, n. 45; State ex rel. Conway v. District Bd., 162 Wis. 482 (dicta); State ex rel. Finger v. Weedman, supra, n. 45; 1909-1910 Atty. Gen. (Wash.) 135; 25 Cal. Ops. Atty. Gen. 316 (1955).

. Donahoe v. Richards, supra, n. 64; Hart v. School Dist., 2 Lanc. L. Rev. 346; Nessle v. Hum, 1 Ohio N. P. 140; Stevenson v. Hanyon, 4 Pa. Dist. Rep. 395; Curran v. White, 22 Pa. Co. Ct. R. 201; Pfeiffer v. Board of Educ., 118 Mich. 560; Kaplan v. Independent School Dist., 171 Minn. 142; People ex rel. Vollmar v. Stanley, 81 Col. 276; Lewis v. Board of Educ., supra, n. 148.

. State ex rel. Weiss v. District Bd., 76 Wis. 177; State ex rel. Dearle v. Frazier, 102 Wash. 369.

. Use of the Bible generally for other than sectarian instruction was permitted in State ex rel. Freeman v. Scheve, supra, n. 45, and People ex rel. Vollmar v. Stanley, supra, n. 156, and its use as a library book was sanctioned in Evans v. Selma Union High School Dist., 193 Cal. 54.

. Board of Educ. of Cincinnati v. Minor, 23 Ohio 211; State ex rel. Clithero v. Showalter, 159 Wash. 519, appeal dismissed 284 U. S. 573.

. State ex rel. Conway v. District Bd., supra, n. 155; Miller v. Cooper, 56 N. M. 355; compare Matter of Dargin, supra, n. 47.

. Miller v. Cooper, supra, n. 160; Tudor v. Board of Educ., 14 N. J. 31, cert. denied 348 U. S. 816.

. Matter of Belman, 78 N. Y. St. Dept. Rep. 10. The version used was drawn from all but would have conformed to none of the versions used by the different faiths.

. Moore v. Monroe; Hackett v. Brooksville Graded School Dist., both supra, n. 45; Church v. Bullock; Wilkerson v. City of Borne, both supra, n. 154; Hart v. School Dist.; Pfeiffer v. Board of Educ.; People ex rel. Vollmar v. Stanley; Kaplan v. Independent School Dist., all supra, n. 156.

. State ex rel. Weiss v. District Bd., supra, n. 157; People ex rel. Ring v. Board of Educ.; Merold v. Parish Bd. of School Directors, both supra, n. 45; Tudor v. Board of Educ., supra, n. 161; see Knowlton v. Baumhover, supra, n. 154.

. Commonwealth v. Renfrew, supra, n. 154, contained a footnote reference to McCollum, supra, n. 20, and Zorach, supra, n. 17; Carden v. Bland, supra, n. 154, found Everson, supra, n. 92, and McCollum irreconcilable and based the decision primarily on State provisions; Miller v. Cooper, supra, n. 160, referred to McCollum, Doremus, supra, n. 154, and Zorach, but said they were not helpful in reaching a decision; Lewis v. Board of Educ., supra, n. 148, p. 528, said the Greater New York Charter provision in question, section 1151, could not violate the Federal Constitution because it contained the proviso that nothing herein “ shall be so construed as to violate the rights of conscience, as secured by the constitution of this State and of the United States.”

. People ex rel. Vollmar v. Stanley, supra, n. 156; Doremus v. Board of Educ., supra, n. 20; Tudor v. Board of Educ., supra, n. 161, and a 1955 California Attorney General's Opinion, supra, n. 46.

. A question not involved in the instant case since no teacher has objected.

. Compare Baer v. Kolmorgen, supra, n. 19, which approved as an accommodation the display of a creche on the school lawn during Christmas recess, Matter of Lewis v. Allen, supra, n. 148, which refused to order discontinuance of the words “ under God ” in the pledge of allegiance, and Konvitz, Fundamental Liberties Of A Free People (1957), 75. For both policy and legal arguments pro and eon concerning the Regent’s prayer, see Pfeifer, supra, n. 71, p. 394.

. Indeed it can hardly be argued, in connection with a campaign to teach moral values, including “respect for lawful authority and obedience to law” (Regents’ Statement, supra, n. 5), that the mere fact that no punishment is provided means that there is no compulsion to an order from the School Board, phrased in mandatory terms. Jefferson’s letter to Miller, supra, n. 42, accords with this view.

. Cf. Justice Frankfurter’s McCollum opinion, 333 U. S. 203, 227 (supra, n. 20). “ The law of imitation operates, and non-conformity is not an outstanding characteristic of children.”

. While some slight cost will be involved in obtaining such an expression from parents, this alone would not give petitioners standing to sue, Doremus v. Board of Educ., supra, n. 20, and, despite Zorach’s reservation of the point, is not considered of a sufficient degree of importance to invalidate the practice. See People ex rel. Lewis v. Graves, 245 N. Y. 195. Particularly is this so since, as we shall see, such an expression is also necessary to protect “free exercise” rights.

. Jefferson’s Notes on Virginia, supra, n. 93, refers to “ coercion ” and innocent people “ burnt, tortured, fined and imprisoned ” and his Act for Establishing Religious Freedom enacted that “ no man shall be compelled to frequent or support any religious worship, place or ministry whatsoever, nor shall be enforced, restrained, molested or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief ”; Madison’s Memorial, to “ force and violence ”, “ torrents of blood ”, “ attempts to enforce by legal sanctions”; Roger Williams’ Bloudy Tenent, Of Persecution For Cause of Conscience (1644) was directed against persecution and blood spilt in the attempt to enforce uniformity of religion; Locke’s A Letter Concerning Toleration (1689) was concerned that “no violence nor injury is to be offered” (Crowder ed., p. 30). Note also the reference in the quotation from Davis v. Beason, supra, n. 122, to “oppressive measures adopted, and the cruelties and punishments inflieted.”

. Mr. Justice Franketjrter’s McCollum opinion, supra, n. 20, p. 277, which concluded that “ [t]he result is an obvious pressure upon children to attend” should be compared with Mr. Justice Jackson’s opinion in the same case (p. 233): “it may be doubted whether the Constitution which, of course, protects the right to dissent, can be construed also to protect one from the embarrassment that always attends nonconformity, whether in religion, politics, behavior or dress.” Jefferson’s reference in his letter to Miller, supra, n. 42, to “ some degree of proscription, perhaps in public opinion ” in the issuance of a Thanksgiving proclamation is also to be compared with the Supreme Court’s recognition in Richardson v. Goddard, 23 How. (64 U. S.) 28, that such a proclamation involved no legal compulsion. For Professor Sutherland the problem is “when embarrassment reaches the point of outrage”, American Council of Education Report, supra, n. 100, pp. 58, 62.

. The brief of Amicus Curies recognizes this. It states (p. 13) : “ Schools are expected and, on appeal to the Commissioner of Education under Section 310 of the Education Law, in a proper case, would be ordered to accommodate each child according to his conscience and his parents’ wishes, by either allowing him to leave the room, or to remain silent throughout the ceremony, or a proper part thereof, as the case may be.” The appeal procedure, however, is not sufficient under a law phrased in mandatory terms. There must be regulations setting forth the rights of parent and child before compulsion has an opportunity to operate.

. While the result is separation, it is separation for the purpose of according to each the right to follow his own religious prepossessions, and in furtherance of spiritual needs which may constitutionally be accommodated. For these reasons, Brown v. Board of Educ., supra, n. 58, p. 495, holding racially segregated educational facilities “ inherently unequal ” is distinguishable.

. Of course, permitting attendance at prayer outside school with exeusal of the lateness of those so doing would fall squarely within the Zorach case, and the Superintendent’s plan for having prayer said a few minutes before 9:00 a.m. would also be acceptable. Of interest, too, is Canon Stokes suggestion, Vol. Ill, p. 684, of a period of silent prayer, a practice which he notes (Yol. I, p. liv) the United Nations has adopted for its meetings.

. Mr. Justice Jackson, dissenting, in Everson, 330 U. S. 1, 27, supra, n. .92 at p. 680.

. 319 U. S. 624, 641, supra, n. 98 at p. 681.

. 333 U. S. 203, 231, supra, n. 20 at p. 666. See, also, Tudor v. Board, of Educ., supra, n. 161 at p. 691.

. Thus Madison’s 11th point in the Memorial inveighed against the bill, “ Because, it will destroy that moderation and harmony which the forebearance of our laws to intermeddle with Religion, has produced amongst its several sects. Torrents of blood have been spilt in the old world, by vain attempts of the secular arm to extinguish Religious discord, by proscribing all difference in Religious opinions.”

. Judge Desmond considered divisiveness and coercion “predilections, not questions of law”, Matter of Zorach v. Clauson, supra, n. 19, p. 177. In any event petitioner’s offered proof of division in this school district over this prayer could not be material, for the ultimate conclusion would then have to be that the Constitution permits in a community in which divisiveness cannot be shown what it prohibits where there is a showing of divisiveness. There is no such constitutional principle.

. The reference in the Barnette case, supra, n. 98, to division over requiring flag salute may be compared with the Report on the Religion and Education Conference for Connecticut, Massachusetts and Rhode Island issued July 27, 1959 by the National Citizens Council for Better Schools. That report lists as a factor which gives rise to “deep tensions” that “Jehovah’s Witnesses refuse to allow their children to salute” (p. 3).

. Jefferson’s Notes, supra, n. 93, stated “Difference of opinion is advantageous in religion. The several sects perform the office of a censor morum over each other”. Hunt, James Madison and Religious Liberty, 1 Ann. Rep. Am. Hist. Assn. (1901), 165, 170, records Madison’s fondness for repeating Voltaire’s aphorism that: “If one religion only were allowed in England, the Government would possibly become arbitrary; if there were two, the people would cut each other’s throats; but as there are such a multitude, they all live happy and in peace,” and Madison’s view that the security for religious rights was the multiplicity of sects. See also Pfeffer, Creeds In Competition (1958), particularly chapter 9, and the New York Times, April 3, 1959, p. 19, col. 5, reporting agreement among the speakers at the annual meeting of the Associated Church Press “that religious tension was a healthy adjunct to a democratic society.”

. The quotation is from the conclusion of the Report on the Religion and Education Conference, supra, n. 182, p. 11, which also stated that: “The conference groups agreed that children should be taught a basic respect for others and that learning an attitude 'of tolerance should be a part of their formal religious as well as secular training.”

. Lewis v. Board of Educ., supra, n. 148, upheld Bible reading in New York City schools; People ex rel. New York League for Separation of Church and State v. Lyons, 173 Misc. 821, held the erection of a prison chapel and employment of a chaplain not to be a violation; Matter of Lewis v. Allen, supra, n. 148, found no violation in school recitation of the pledge of allegiance with the words “under God”; and Baer v. Kolmorgen, supra, n. 19, allowed display of a creche on a school lawn during school Christmas reeess.

. The first three cases cited in n. 185 also interpret this section. In addition see O’Connor v. Hendrick, 184 N. Y. 421, holding that teachers wearing religious garb, and Smith v. Donahue, 202 App. Div. 656, holding that the furnishing of textbooks to parochial school children did violate the section, and People ex rel. Lewis v. Graves, supra, n. 171, holding released time not violative. Judd v. Board of Educ., supra, n. 23, which invalidated use of public funds for bus transportation of parochial students was changed by the 1938 amendment to the section. Also of interest is the Report of the Committee on Education and Funds Pertaining Thereto to the 1894 Constitutional Convention (Revised Record Of The Constitutional Convention Of The State Of New York, May 8, 1894 To September 29, 1894 [1900], Yol. 5, p. 693). The committee (p. 706) recognized that its words could not bind a court, but stated its opinion to be that the section could not “ be taken to prohibit the reading of the Bible in the public schools.”

. Matter of Ahern v. Board of Supervisors, 6 N Y 2d 376; Matter of Andresen v. Rice, 277 N. Y. 271, 282.